## In re EVERGREEN SECURITY, LTD., Debtor.

### No. 6:01–bk–00533–ABB.

United States Bankruptcy Court, M.D. Florida, Orlando Division.

Jan. 2, 2008.

---

See also 363 B.R. 267.

888

Allan E. Wulbern, Smith, Hulsey & Busey, Jacksonville, FL, Mariane L. Dorris, R. Scott Shuker, Latham Shuker Eden & Beaudine LLP, Orlando, FL, for Debtor.

Jacqueline E Ferris, Latham Shuker Eden & Beaudine LLP, Kenneth C. Meeker, United States Trustee, Orlando, FL, for Trustee.

### ORDER

ARTHUR B. BRISKMAN, Bankruptcy Judge.

This matter came before the Court on the Motion for Sanctions Pursuant to Federal Rule of Bankruptcy Procedure 9011 (Doc. 1542) ("Rule 9011 Motion") filed by the Debtor Evergreen Security, Ltd. ("Evergreen") through its President R.W. Cuthill, Jr. ("Cuthill") seeking sanctions against the attorneys Scott W. Spradley ("Spradley"), Maureen A. Vitucci ("Vitucci"), and Peter R. Ginsberg ("Ginsberg"), the law firms of GrayRobinson, P.A. ("GrayRobinson") and Peter R. Ginsberg, P.C.[1] (collectively, the "Respondents") relating to the Respondents' Motion for Recusal, Motion to Disqualify, Disclosure of All Ex Parte Communications and Revocation of All Prior Orders (Doc. No. 1508) ("Recusal Motion").

Evergreen filed a Motion for Fees and Costs Pursuant to 28 U.S.C. Section 1927 (Doc. No. 1624) (collectively with the Rule 9011 Motion, "Sanctions Motions") seeking sanctions against the Respondents relating to the Recusal Motion. The Section 1927 Motion will be addressed in a separate Order. The Respondents filed various responses to the Sanctions Motions.[2]

Also before the Court is the Order to Show Cause entered on August 17, 2007 (Doc. No. 1700) directing the Respondents to appear on August 28, 2007 and show cause, among other things, why their signing, filing, presenting, and/or advocating of the Recusal Motion was not done in bad faith.

A final evidentiary hearing on the Sanctions Motions and Order to Show Cause was held on August 28, 2007 at which the Respondents, their respective counsel, counsel for Evergreen, counsel for Cuthill, and Biff Marshal, a representative of GrayRobinson, appeared. The parties, pursuant to being granted leave to file and serve closing statements, filed post-hearing briefs.[3]

■ The central issues for determination are whether the Respondents presented and advocated the Recusal Motion in bad faith and, if they did, what sanctions are to be imposed against them.[4] The

---

1. Ginsberg and his firm Peter R. Ginsberg, P.C. shall be referred to collectively herein as "Ginsberg."

2. *See* Doc. Nos. 1655, 1656, 1657, 1658, 1659, 1676, 1677, and 1678.

3. *See* Doc. Nos. 1717, 1722, and 1723.

4. Evergreen is not pursuing sanctions against any individual or entity other than the Re-

spondents. The Respondents' clients (*see infra* p. 889 for definition of "Clients") are culpable for any wrongful conduct in connection with the signing, filing, and advocating of the Recusal Motion pursuant to Federal Rule of Civil Procedure 9011(c), 11 U.S.C. Section 105(a), and the Court's inherent powers (*see, also, Byrne v. Nezhat*, 261 F.3d 1075, 1117–18 (11th Cir.2001)) (explaining the imposition of sanctions against a represented party is

Court makes the following Findings of Fact and Conclusions of Law after reviewing the pleadings and evidence, hearing live testimony and argument, and being otherwise fully advised in the premises.

### FINDINGS OF FACT

### I. BACKGROUND

### A. COUNSEL

Cuthill and Evergreen have been represented throughout the above-captioned case ("Evergreen Main Case") and its related adversary and involuntary proceedings by the law firm of Latham Shuker Eden & Beaudine L.L.P. (formerly Gronek & Latham, LLP), with R. Scott Shuker ("Shuker") as lead counsel.[5] The law firm of Smith Hulsey & Busey ("Busey Firm") represents Cuthill in the Recusal Motion and Sanctions Motions proceedings.

The Respondents jointly represented Jon M. Knight ("Knight"), J. Anthony Huggins ("Huggins"), Mataeka, Ltd. ("Mataeka"), Atlantic Portfolio Analytics & Management, Inc. a/k/a APAM ("APAM"), and International Portfolio Analytics, Inc. ("IPA") (collectively, the "Clients") in the Evergreen Main Case and its related adversary and involuntary bankruptcy proceedings.[6] Mataeka, APAM, and IPA are companies Knight and Huggins either owned and/or controlled. GrayRobinson first entered its appearance on November 29, 2001 through the filing of an Answer as counsel for Mataeka, Knight, Huggins, and APAM in *J.W. Cuthill, Jr. v. Mataeka, Ltd., et al.*, Adversary Proceeding No. 6:01–ap–00232–ABB (the "Mataeka AP").[7] Ginsberg became involved in the bankruptcy proceedings in April 2005 upon the entry of an Order granting GrayRobinson's Motion for him to appear *pro hac vice*.[8]

GrayRobinson is a Florida law firm with approximately 210 attorneys and ten offices. Spradley and Vitucci are members of the firm's Creditors' Rights and Bankruptcy Department. John A. Anthony ("Anthony") is the Chair of GrayRobin-

---

"proper if she knew or should have known that the allegations in the complaint were frivolous."). The Clients' culpability will not be addressed in this Order due to the Clients' entry into a global settlement (*see infra* Section VII for a discussion the settlement).

5. Cuthill was appointed the Chapter 11 Trustee in the Evergreen Main Case on March 14, 2001 (Doc. Nos.89, 90). Cuthill is the President and sole shareholder of Evergreen pursuant to Evergreen's Joint Plan of Reorganization as Modified, which was confirmed on June 18, 2004 (Doc. Nos. 1025, 1063, and 1146). All rights and powers vested in the Chapter 11 Trustee were transferred to Cuthill as the President of Evergreen pursuant to the terms of the confirmed Plan and Confirmation Order. Accordingly, "Cuthill" and "Evergreen" shall be used interchangeably throughout this Order regarding post-confirmation events.

6. The Respondents asserted at various times GrayRobinson was counsel for Huggins, Mataeka, APAM, and IPAM and local counsel for Ginsberg and Ginsberg was counsel for Knight. The Respondents' actions and statements made throughout the Evergreen proceedings and related proceedings reflect they jointly represented all of the Clients. For example, GrayRobinson filed a Motion to Appear *Pro Hac Vice* in the Mataeka AP moving for the admission of attorney Ginsberg "for purposes of appearing as *co-counsel* on behalf of Jon M. Knight, defendant herein ...." (*emphasis added*). The Motion designates attorney Vitucci as the "person to whom the Court and counsel may readily communicate and upon whom papers may be served." GrayRobinson filed claims in the Knight, Huggins, and APAM involuntary cases for unpaid fees and costs arising from prepetition legal services.

7. Mataeka AP Doc. No. 4. GrayRobinson was formerly known as "Gray, Harris & Robinson, P.A."

8. *Id.* Doc. Nos. 54, 55.

son's Creditors' Rights and Bankruptcy Department.[9]

Spradley and Vitucci are members of the Florida Bar and the Bars of all Florida State and Federal Courts, including the Bar of this Court. They are active members of local Orlando bar organizations. Each has a high level of expertise in creditors' rights and bankruptcy matters. Spradley has been practicing law since 1988. He has been a partner with Gray-Robinson for nine years. He has appeared before this Court for over fourteen years. His demeanor before this Court has consistently been composed and professional.

Vitucci is an associate attorney in Gray-Robinson's bankruptcy department who has been in private practice for approximately four years. She formerly clerked for the Honorable Karen S. Jennemann with this Court. Spradley is Vitucci's immediate supervisor.

Ginsberg is an attorney residing in New York with an office in New York City. He has been practicing law for over twenty-five years. He served as an Assistant United States Attorney in New York for approximately seven years. He is the owner and principal of Peter R. Ginsberg, P.C. He is a member of the New York, Vermont, and District of Columbia Bars. He is not licensed to practice law in Florida and is not admitted to practice in the United States District Court for the Middle District of Florida. His primary practice areas are white collar criminal defense, complex commercial matters, and sports law.[10]

Ginsberg's demeanor before this Court and in depositions, as evidenced by the transcripts and testimony of counsel present at the depositions, has been antagonistic to the point of hostile. The Court had to admonish Ginsberg at certain times for his unprofessional behavior.

## B. THE MATAEKA JUDGMENT

The genesis of the Recusal Motion and resulting Sanctions Motions was the entry of a multi-million dollar judgment in favor of Cuthill and against the Clients in the Mataeka AP.

Evergreen was a Ponzi scheme through which investment certificates, misrepresented as being fully secured by stable U.S. mortgage-backed securities and instead were tied to volatile mortgage backed security derivatives, were sold to investors.[11] Claims in excess of $380,000,000.00, consisting mostly of investor claims, have been filed with listed assets of less than $1,000,000.00 when Evergreen filed its voluntary Chapter 11 petition on January 23, 2001.[12]

Knight and Huggins, acting individually and through a web of various entities, were principal actors in the Ponzi scheme. Both men are highly educated, sophisticated businessmen with extensive experience in finance and financial management.

Knight and Huggins were indicted by a New York grand jury in August 2002 for the alleged theft of $6,500,000.00 from Evergreen Trust in December 1997. Evergreen Trust was a wholly owned trust

9. Respondents' Exh. II at p. 5, ll. 9–14.

10. Doc. No. 1657.

11. *R.W. Cuthill Jr., Trustee v. Harold James Kime and First Am. Life and Health Ins. Corp. (In re Evergreen Sec. Ltd.),* 319 B.R. 245 (Bankr.M.D.Fla.2003). The decision was appealed to the United States District Court for the Middle District of Florida, Orlando Division and the parties dismissed the appeal by stipulation before any briefs were filed (*see* District Court Civil Action No. 6:03–cv–01677–JA).

12. Approximately 1,600 claims totaling $380,630,019.97 have been filed in Evergreen's case.

created by Evergreen to pool investor funds and purchase investments. Huggins and Knight pled guilty to lesser charges in two Plea Agreements in December 2004. Huggins pled guilty to misdemeanor criminal possession of stolen property in the fifth degree and Knight pled guilty to attempted grand larceny in the first degree in violation of New York law. They were each sentenced to three years probation and fined $50,000.00.[13] Ginsberg represented Knight in the New York criminal proceedings.

Cuthill instituted the Mataeka AP seeking the recovery of fraudulently transferred funds. The Mataeka AP trial was a multi-day trial beginning on June 8, 2005 and concluding on November 8, 2005. Knight and Huggins were found to have fraudulently transferred $6,500,000.00 from Evergreen Trust to Mataeka, their alter ego, and then to themselves and others. Judgment was entered on March 22, 2006 against Knight, Huggins, and Mataeka jointly and severally, in the amount of $4,889,053.90, plus prejudgment interest in the amount of $3,052,467.69, and against APAM in the amount of $2,500,000.00 ("Mataeka Judgment").[14]

The Clients appealed the Mataeka Judgment to the United States District Court for the Middle District of Florida, Orlando Division ("District Court"). They did not seek a stay pending appeal. The District Court affirmed the Mataeka Judgment on March 30, 2007 and the Clients appealed the decision to the United States Court of Appeals for the Eleventh Circuit ("Eleventh Circuit").[15] The Clients, pursuant to the global settlement, dismissed the Eleventh Circuit appeals with prejudice.[16]

## C. POST–MATAEKA JUDGMENT EVENTS

Cuthill, while the Mataeka Judgment appeal was pending, instituted collection actions and discovery in aid of execution of the Mataeka Judgment. He issued writs of garnishment against GrayRobinson and Ginsberg, resulting in turnover of $1,095,983.47 from GrayRobinson's trust account. Cuthill applied the $1,095,983.40 to Mataeka's, Knight's, and Huggins' liability for the Mataeka Judgment.

Cuthill, as the petitioning creditor, filed involuntary Chapter 7 bankruptcy cases against Knight, Huggins, and APAM captioned: *In re Jon M. Knight,* Case No. 6:06–bk–01547–ABB; *In re J. Anthony Huggins,* Case No. 6:06–bk–01546–ABB; *In re Atlantic Portfolio Analytics & Management, Inc.,* Case No. 6:06–bk–01549–ABB (collectively, the "Involuntary Cases"). Cuthill sought, on an emergency basis, appointment of an interim trustee in the Huggins and Knight cases. His motions were granted after the conclusion of contested hearings on July 12, 2006.

Orders granting Cuthill's interim trustee motions were entered on July 14, 2006.[17]

---

13. Several other individuals involved with Evergreen have been convicted of or pled guilty to crimes relating to Evergreen's business practices.

14. Mataeka AP Doc. Nos. 87, 88.

15. District Court Case No. 6:06–cv–00837–JA Doc. Nos. 57, 58, 59. They also appealed the District Court's March 20, 2007 Order (Doc. No. 55) allowing Cuthill's supplementation of the record with the Order Denying the Recusal Motion entered by this Court on February 27, 2007.

16. Eleventh Circuit Case No. 07–11933–HH. Mataeka, Knight, and APAM's joint motion to dismiss their appeal with prejudice was granted by the Eleventh Circuit on June 20, 2007. Huggins' motion to dismiss the appeal "with prejudice due to settlement" was granted on August 1, 2007.

17. Case No. 6:06–bk–01547–ABB, Doc. No. 12; Case No. 6:06–bk–01546–ABB, Doc. No. 12.

The Clients did not seek reconsideration or appeal of the Orders. Leigh R. Meininger is the duly-appointed Chapter 7 Trustee ("Meininger") of each of the Involuntary Cases.[18]

The involuntary debtors contested the involuntary filings and evidentiary hearings were held on July 26, 2006 and February 22, 2007.[19] Cuthill established he was entitled to relief pursuant to Section 303(b)(2) of the Bankruptcy Code and Orders for relief were entered in the Involuntary Cases on March 29, 2007.[20]

The focal point of Knight's and Huggins' involuntary cases, and the impetus for the filing of the emergency motions to appoint a trustee, was their interests in two offshore trusts, the Pacific Trust and the Arctic Trust.[21] The existence of the trusts was discovered during the depositions of Knight and Huggins conducted by Evergreen on June 5, 2006 in aid of execution of the Mataeka Judgment. Huggins listed his interest in the Arctic Trust as an asset in his original Schedule B with a value of $6,500,000.00.[22]

Cuthill and Meininger sought turnover of the trust assets. Knight and Huggins resisted the turnover efforts. They disputed Cuthill's ability to reach the trust assets, contending the trusts were exempt from execution by creditors. They did not respond to discovery requests seeking information regarding their assets, debts, income, and expenses.[23] Cuthill filed emergency motions to compel production, which were granted by Orders entered on July 19, 2007 (collectively, the "Orders to Compel") in Knight's and Huggins' cases.[24]

## II. RECUSAL MOTION

### A. THE PLEADING

The Clients filed the Recusal Motion on July 27, 2006, the day following the beginning of the trials on the Knight and Huggins involuntary petitions. They sought recusal of the undersigned Judge from further involvement in the Evergreen case and all other cases involving the Clients. They sought the disqualification of Shuker and his law firm and the revocation of *all* orders entered in the Evergreen Main Case and in *all* other proceedings involving the Clients.[25]

---

**18.** Meininger was appointed the Chapter 7 Trustee of the APAM case in March 2007 after the Order for Relief was entered.

**19.** The evidentiary hearings on the involuntary petitions were commenced and then held in abeyance during the pendency of the Recusal Motion.

**20.** Section 303 of the Bankruptcy Code sets forth against whom an involuntary case may be commenced, who may be a petitioning creditor, and how many creditors are required to file an involuntary case. An evidentiary hearing is held after an involuntary case is filed to determine whether the requirements of Section 303 have been met.

**21.** Knight created the Pacific Trust on July 18, 1994. The initial Protector of the trust was Huggins.

**22.** Knight did not list an interest in the Pacific Trust as an asset in his Schedules. Huggins

amended his Schedule B to dispute that his interest in The Arctic Trust constitutes property of the estate ("any Interest is NOT property of the estate pursuant to 11 U.S.C. Sect. 541(c)(2)") and amended its value to "Unknown."

**23.** Evergreen, as the petitioning creditor in each of the Involuntary Cases, propounded discovery prior to the appointment of Meininger as Chapter 7 Trustee. Shuker and his firm were engaged as special counsel for Meininger after Meininger's appointment.

**24.** Case No. 6:06-bk-01547-ABB, Doc. No. 18; Case No. 6:06-bk-01549, Doc.No. 18.

**25.** In their prayer for relief they request: "... that this Court recuse itself and disqualify Gronek & Latham, LLP in all matters in this case and all other adversary proceedings, contested matters and related cases in which

The Recusal Motion consists of thirty-one pages of text with 596 pages of exhibits. More than two-thirds of the Recusal Motion consists of allegations directed against the undersigned Judge. It was not filed under seal. It was filed in the Evergreen Main Case and not in any of the related cases. No expedited or emergency relief was requested and no request was made that any pending matters be held in abeyance.

The primary contentions in the Motion for Recusal are:

(a) the Judicial Council of the Eleventh Circuit Court of Appeals [26] ("Judicial Council") was conducting an "investigation" of the undersigned Judge stemming from an alleged complaint filed by attorney Phillip M. Hudson, III ("Hudson") against the undersigned Judge in relation to events in *Advanced Telecommunications Network, Inc. v. Daniel W. Allen and David D. Allen,* AP No. 6:03–ap–122–KSJ [27];

(b) the undersigned Judge, as a result of the investigation, was not impartial and was required to recuse himself in all matters in the Evergreen case and all other adversary proceedings, contested matters and related cases in which the Clients are parties;

(c) the undersigned Judge engaged in *ex parte* communications with Shirker, specifically in connection with the transmittal by Shirker of a forty-six page proposed findings of fact and conclusions of law and the entry of the Orders to Compel, and, as a result, was required to recuse himself; and

(d) Shuker committed violations of the Florida Rules of Professional Conduct.

The request for disqualification of Shirker and his law firm is peripheral to the demand for the recusal of the undersigned Judge. The core of the Recusal Motion consists of the allegations of an "investigation" by the Judicial Council and *ex parte* communications *directed* by the Court with Shirker. The word "investigation" appears twelve times and is implied fourteen times.

Allegations the undersigned Judge "directed" or "ordered" "*ex parte* communications" with Shuker appear seven times. The primary alleged *ex parte* communication was a forty-six page proposed findings of fact and conclusions of law submitted by Shuker in the Mataeka AP ("46–Page FOFCOL"), which the Clients and the Respondents contend the Court directed be submitted *ex parte* and impermissibly used

the Movants are parties, disclosure of all *ex parte* communications and filings in all matters in this case and all other adversary proceedings, contested matters and related cases in which the Movants are parties, and revocation of all Orders previously entered in all matters in this case and all other adversary proceedings, contested matters and related cases in which the Movants are parties and further relief as this Court deems just and equitable." Recusal Motion at pp. 29–30.

**26.** The Respondents erroneously refer to the Judicial Council of the Eleventh Circuit Court of Appeals throughout their pleadings and

presentations as the "11th Circuit Court of Appeals."

**27.** An adversary proceeding to recover alleged fraudulent transfers was instituted against Daniel W. Allen and David D. Allen in the adversary proceeding *Advanced Telecommunications Network, Inc. v. Daniel W. Allen and David D. Allen,* AP No. 6:03–ap–122–KSJ ("ATN AP"). Shuker is counsel for the debtor/plaintiff ATN and Hudson is counsel for the defendants. The ATN AP and the underlying ATN main case were reassigned from the undersigned to the Honorable Karen S. Jennemann on September 20, 2004.

its contents. They insinuate a sinister relationship exists between the Court and Shuker causing detriment to the Clients.

A significant portion of the Recusal Motion is devoted to the Clients revisiting unfavorable rulings. These are all matters that should have been addressed through motions for reconsideration and/or appeals and do not constitute a proper basis for a recusal motion.

The specific Recusal Motion allegations include:

1. "Judge Briskman presiding here is, himself, under investigation by the 11th Circuit Court of Appeals following *ex parte*, allegedly inappropriate communications with Mr. R. Scott Shuker ..." [28]

2. "a series of dubious judicial actions taken in conjunction with Mr. Shuker in the Mataeka Adversary Proceeding and in the Involuntary Bankruptcy Proceedings." [29]

3. "inappropriate *ex parte* communications in the Mataeka Adversary Proceeding." [30]

4. "threats by Mr. Shuker in the Involuntary Bankruptcy Proceedings to seek incarceration of the individual Movants as well as one of the individual Movants' attorneys, in violation of the Code of Professional Conduct governing the activities of attorneys" [30] and " ... Mr. Shirker's ... promises of obtaining, the incarceration of the individual Movants ...";[31] and

5. "in the Mataeka Adversary Proceeding, threats to file a Bar grievance against the other individual Movant's attorney, also in violation of the Code of Professional Conduct." [32]

6. "This situation presents an impermissible appearance of impropriety and a lack of impartiality warranting recusal under 28 U.S.C. § 455(a) ..." [33]

7. "Gronek & Latham should be disqualified both for the reasons set forth above governing the need for impartiality in court proceedings and based upon Mr. Shuker's unethical threats of seeking, and promises of obtaining, the incarceration of the individual Movants and similar threats directed at Movants' counsels."[34]

8. "Disclosure of all *ex parte* communications and filings in this case and in all other adversary proceedings, contested matters and related cases in which the Movants are parties, as well as the revocation of all Orders and Judgments rendered in this case and in all other adversary proceedings, contested matters and related cases in which the Movants are parties, also is necessary in order to rectify the taint that overshadows the proceedings at issue and in order to assure that all litigants receive fair and impartial justice." [35]

9. "inappropriate plotting between Judge Briskman and Mr. Shuker about setting up parties to the litigation for arrest ..." in the ATN AP.[36]

10. The undersigned failed to require proper proof from Mr. Shuker in the ATN case.[37]

**28.** Recusal Motion at p. 2.

**29.** *Id.*

**30.** *Id.*

**31.** *Id.* at p. 3.

**32.** Recusal Motion at pp. 2–3.

**33.** *Id.* at p. 3.

**34.** *Id.*

**35.** *Id.*

**36.** Recusal Motion at p. 4.

**37.** *Id.* at p. 5.

11. "... Defendants' counsel in [the ATN AP] filed a Complaint in the 11th Circuit concerning Judge Briskman's conduct. That Complaint, upon information and belief, remains the subject of an ongoing investigation."[38]

12. "Mr. Shuker approached [Knight and Huggins] outside the door of the Court and announced that, if the individual Movants did not have an acceptable settlement proposal to his office immediately, the individual Movants would 'end up in jail,' and that Mr. Huggins, 67–years old, 'would die in jail.' "[39]

13. Shuker threatened to have Spradley arrested for trespassing at a deposition and "[t]his was not the first time that Mr. Shuker had threatened to use what he apparently thought was his court-granted right to threaten imprisonment."[40]

14. "Mr. Shuker continued to craft his own set of procedures, as endorsed by the Court."[41]

15. "On July 19, 2006, before the individual Movants could file responsive papers or appear for a hearing, Judge Briskman signed an Order, apparently presented *ex parte* to the Court by Mr. Shuker, for expedited discovery. This was accomplished without a hearing even though Mr. Shuker conceded in the motion that opposing counsel objected to the requested relief."[42]

16. "Over Movants' objection in the Mataeka Adversary Proceeding, the Court ordered the parties, at a point mid-way through the trial, to file *ex parte* proposed findings of fact and conclusions of law."[43]

17. "At the end of the trial, the Court again directed the filing of *ex parte* proposed findings of fact and conclusions of law."[44]

18. "The Court thereupon, without hearing from the individual Movants and without providing the individual Movants with an opportunity to review a proposed Order that Mr. Shuker had provided *ex parte* to the Court, executed the Order granting expedited discovery [in the involuntary cases]."[45]

19. "Where a federal judge's conduct is the subject of an investigation, the public may reasonably question whether he will favor a crucial party or witness to the investigation who appears before him in an effort to curry favor with that party or witness. This public concern is exacerbated where, as here, the conduct at issue is not one that merely concerns private affairs but one that relates directly to the judicial processes, namely the integrity of trial transcripts, and a party's due process rights and liberty. The appearance of bias is unavoidable."[46]

20. "It is natural for a person under investigation to hesitate before doing anything that may compromise his position in that investigation. Here, the problem is all the more acute since both the presiding judge and opposing counsel are the key players in the investigation, may be witnesses against or in support of one another and the conduct

---

**38.** *Id.* at p. 7. *See supra* n. 27 for the definition of "ATN AP."

**39.** *Id.* at p. 9.

**40.** Recusal Motion at p. 9.

**41.** *Id.* at p. 10.

**42.** *Id.* at pp. 10–11.

**43.** *Id.* at p. 12.

**44.** Recusal Motion at p. 13.

**45.** *Id.* at p. 15.

**46.** *Id.* at p. 19.

in *Advanced Technologies* and the case at bar is strikingly similar, thus raising the appearance of partiality to a higher degree." [47]

21. "Indeed, the Bankruptcy Code specifically precludes the type of *ex parte* communications that the Court ordered on at least two occasions in the case at bar." [48]

22. "... the 11th Circuit has been scrutinizing the activities of Judge Briskman and Mr. Shuker...." [49]

23. "Here, neither the Court nor Mr. Shuker disclosed to the opposing parties the existence of the 11th Circuit investigation into their joint improprieties." [50]

24. "... Mr. Shuker took advantage of the clandestine filings by blatantly flaunting the page limits imposed on Movants." [51]

25. "Mr. Shuker clearly felt empowered to threaten incarceration and the filing of Bar grievances notwithstanding the clear ethical impropriety of such actions. Similarly, he appears to have received a judicial nod to continue to ignore the automatic stay that, as a matter of law, should be in place in all of these proceedings." [52]

26. "[Mr. Shuker's] threats to secure the incarceration of the individual Movants as well as one of the lawyers for the Movants violated the Disciplinary Rules governing the conduct of attorneys ... It is also impermissible for a member of the Florida Bar to threaten another attorney with the filing of a bar complaint." [53]

Vitucci signed the Recusal Motion. The block beneath her signature sets forth her name and Spradley as GrayRobinson counsel representing "Mataeka, Ltd., International Portfolio Analytics, Inc., Atlantic Portfolio Analytics & Management, Inc., and J. Anthony Huggins." A block follows containing Ginsberg's name, his New York City firm address, contact information, and the statement "Attorneys for Jon M. Knight."

Spradley read the Recusal Motion before it was filed and authorized its filing.[54] He understood, at the time of filing the Recusal Motion, he was subject to Federal Rule of Bankruptcy Procedure 9011.[55] He conceded the allegations are vicious.[56]

Spradley, Ginsberg, Vitucci and the Clients are signers, submitters, and advocators of the Recusal Motion and are subject to Federal Rule of Bankruptcy Procedure 9011. They, by signing, filing, submitting, and advocating the Recusal Motion, certified to the Court that to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) the Recusal Motion was not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument

---

47. *Id.* at p. 21.

48. Recusal Motion at p. 23.

49. *Id.*

50. *Id.* at p. 27.

51. *Id.*

52. Recusal Motion at p. 26.

53. *Id.*

54. Dec. 11, 2006 Hr'g Tr., p. 110, ll. 5–9.

55. *Id.* at ll. 10–17.

56. Aug. 28, 2007 Hr'g Tr. vol. 2, p. 134, ll. 1–3.

for the extension, modification, or reversal of existing law or the establishment of new law; and

(3) and the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

GrayRobinson and Ginsberg's firm are culpable for any violations of Rule 9011 by Spradley, Ginsberg, or Vitucci.

## B. RECUSAL MOTION PROCEEDINGS

Evidentiary hearings on the Recusal Motion were held on November 29, 2006, December 11, 2006, and January 29, 2007. Ginsberg was lead counsel in the prosecution of the Recusal Motion. Spradley and Vitucci provided support to Ginsberg.

Shuker, Spradley, and Knight testified as fact witnesses. Justice Major B. Harding ("Harding"), a retired Chief Justice of the Supreme Court of Florida, testified as the Respondents' expert witness and Professor Steven Lubet, Professor of Law at Northwestern University School of Law ("Lubet"), testified as Evergreen's expert witness. Harding and Lubet testified as to the standards governing judicial conduct and recusal. Harding addressed the standards governing the conduct of counsel.

Lubet, having testified in two federal judicial impeachment proceedings both involving recusal, was qualified to testify as an expert regarding recusal matters involving federal judges.[57] Harding had actual experience only with state court recusal matters and lectured on recusal proceedings involving federal judges or in the application of the Judicial Council Rules.[58] Ginsberg knew Harding did not have any experience with federal recusal matters.[59]

The majority of Ginsberg's examinations of witnesses revolved around the submission by Shuker of the 46–Page FOFCOL in the Mataeka AP, which the Respondents contend constituted an improper *ex parte* communication that the Court directed be submitted and impermissibly used its contents. The majority of the questions posed by Ginsberg at trial related to *ex parte* communications allegations. More than one hundred questions posed by Ginsberg related to the 46–Page FOFCOL. The Respondents made the 46–Page FOFCOL a central issue in the Recusal Motion trial.

The other central component of the Recusal Motion trial was the alleged "investigation" of the undersigned Judge in relation to Hudson's alleged judicial complaint. Nearly one hundred questions posed by Ginsberg related to the alleged "investigation." The Respondents did not establish a judicial complaint had been filed.

A minority of questions related to Shuker's alleged violations of the Florida Rules of Professional Conduct, further evidencing the Respondents' allegations made against Shuker were peripheral to the allegations made against the undersigned.

The Recusal Motion was denied by the Order entered on February 27, 2007 (Doc. No. 1643) ("February 27, 2007 Order"). The Court found:

The Court did not direct or suggest the parties not exchange their proposed FOFCOL at any point in these proceed-

---

57. Nov. 29, 2006 Hr'g Tr. vol. 2, p. 10, ll. 10–13.

58. *Id.* vol. 1, p. 63, ll. 1–6; p. 79, ll. 15–25; p. 132, ll. 16–19.

59. Aug. 28, 2007 Hr'g Tr. vol. 2, p. 38, ll. 10–13.

ings. The parties, for their own reasons, decided to not exchange their FOFCOL. The Court did not engage in *ex parte* communications with any of the parties. ...

The Recusal Motion was not filed in good faith ... The Recusal Motion is devoid of substance and is unfounded ... The Movants and their attorneys were unyielding in their litigation of the Recusal Motion, even when the Recusal Motion was exposed as unfounded at trial ... [60]

The concluding paragraph of the February 27, 2007 Order summarizes the Court's findings and conclusions:

The lack of any supporting evidence, the timing of filing, and the extraordinary relief requested reflect the Movants filed the Recusal Motion to frustrate Evergreen's collection efforts and to harass the Court and Evergreen's counsel. The Movants and their counsel abused the recusal statutes, this Court, Evergreen and its counsel by filing the Recusal Motion for an improper purpose. They subverted the Rules of Professional Conduct by invoking the Rules as offensive procedural weapons. Their actions are corrosive to the proper functioning and the integrity of the judicial system.[61]

No reconsideration of the February 27, 2007 Order was sought nor was it appealed. It is a final, nonappealable Order.[62] The findings and conclusions of the February 27, 2007 Order are fully adopted and incorporated herein.

## C. DISTRICT COURT MANDAMUS PROCEEDINGS

The Respondents, while the Recusal Motion was pending, filed and advocated petitions in the District Court seeking the issuance of writs of mandamus against the undersigned Judge.[63] Their District Court pleadings repeat the Recusal Motion allegations and are equally rancorous. The pleadings were not filed under seal. The District Court expeditiously disposed of the petitions finding they were without factual or legal support.

The allegations focus on the alleged "investigation" and *ex parte* communications:

(i) "Judge Briskman is under investigation by the 11th Circuit Court of Appeals."

(ii) "The existence of the 11th Circuit investigation ... combined with Judge Briskman's failure to have disclosed the investigation mandates recusal."

(iii) "Judge Briskman has an interest in the outcome of the case at bar because he faces potential career-ending punishment for activities with the same people who are involved."

(iv) "The instant proceedings have involved a series of dubious judicial actions taken in conjunction with Shurker."

60. Feb. 27, 2007 Order at pp. 49, 55–6.

61. *Id.* at p. 57.

62. The Feb. 27, 2007 Order is published at *In re Evergreen Sec., Ltd.,* 363 B.R. 267 (Bankr. M.D.Fla.2007).

63. They instituted two District Court cases through filing petitions for writs of mandamus: *Mataeka, Ltd., et al. v. United States District Court, et al.,* Case No. 6:06–cv01210–JA–KRS (in which they filed a Petition, a second petition titled "Supplemental Petition," and a third petition); *Mataeka, Ltd., et al. v. Briskman,* Case No. 6:06–cv–01807–JA–JGG (in which they re-filed the third petition filed originally in 6:06–cv–01210–JA–KRS). In essence, four petitions were filed.

(v) The undersigned engaged in "inappropriate *ex parte* communications in the instant action."

(vi) An "extra-judicial relationship" existed "between Judge Briskman and Mr. Shirker." [64]

The word "investigation" appears seventy times and the phrase *"ex parte"* appears forty-five times throughout the petitions. The Respondents devoted a significant portion of their pleadings to disputing unfavorable rulings. [65]

Each of the petitions was signed by Vitucci with Spradley's name appearing in the signature block and filed jointly by GrayRobinson and Ginsberg. The tenor and content, specifically the identical language found in the Recusal Motion, indicate Ginsberg played a central role in the drafting and filing of the District Court pleadings. [66]

The Respondents fluctuated in the relief they sought from the District Court. They requested in their first Petition ("First Petition") a writ of mandamus be issued "directing Judge Briskman to render a decision regarding the pending [Recusal] Motion" and "Moreover, in the

interim ... that Judge Briskman be directed to stay all related proceedings." [67]

They filed a Supplemental Petition seeking relief more expansive and contradictory to the relief sought in the First Petition:

... that a Writ of Mandamus be issued, directing Judge Briskman to recuse himself from all matters in this case and all other adversary proceedings, contested matters and related cases in which the Movants are parties, and that an impartial judicial officer preside over the Motions seeking disqualification of Plaintiff's counsel, disclosure of all *ex parte* communications and filings in this case and all related proceedings, and revocation of all Order previously entered in the instant and related actions. Moreover, in the interim pending resolution of the pending Motions, it is respectfully requested that Judge Briskman be directed to stay all related proceedings. [68]

The District Court, by Order entered on September 20, 2006, denied the Respondents' First and Supplemental Petitions:

If, upon entry of the order [ruling on the Recusal Motion], Petitioners believe the bankruptcy judge's decision to be erro-

---

**64.** They further alleged: "Judge Briskman may have an incentive to rule favorably on motions and requests by Shuker ... He also has an interest in brushing the matter under the carpet as best he can, including trying to retain authority over these very important issues of judicial and professional conduct."

**65.** For example, they protest: "Judge Briskman's lengthy [Mataeka] Judgment and Order, that essentially ignores the entirety of a protracted trial involving approximately a dozen witnesses and well over one hundred exhibits, and which unquestionably asserts findings and conclusions that are wholly and quantifiably inaccurate and lacking in any support in the trial record." District Court Case No. 6:06–cv–1210–ORL–31 Doc. Nos. 3 and 24 at p. 4, respectively. "Judge Brisk-

man has now compounded the problem caused by his refusing to recuse himself from the instant matter by rendering an Order designed solely to protect himself while compromising the integrity of the matters pending before the Court." *Id.* Doc. No. 24, p. 5. "Ignoring the absolute dearth of evidence justifying the appointment of an interim trustee [in the Involuntary Cases], and without making a single finding of fact on the record or in his Order, Judge Briskman granted the appointment." *Id.* Doc. No. 3, p. 7.

**66.** *See infra* Section VI "Division of Labor."

**67.** District Court Case No. 6:06–cv–01210–JA–KRS Doc. No. 1 at p. 6.

**68.** *Id.* Doc. No. 3 at p. 24.

neous, they have the readily available remedy of appealing the decision.

Petitioners also allege a basis for recusal that the Eleventh Circuit Court of Appeals has undertaken an investigation of the bankruptcy judge for engaging in ex parte communications during *the course of another proceeding.* Notwithstanding these allegations, *there is no evidence before this court that such an investigation has been undertaken, let alone that there has been a finding of wrongdoing on the part of the judge.* If there is such an investigation, and it results in a finding that the bankruptcy judge engaged in ex parte communications *relevant to these proceedings,* Petitioners may bring the matter to the attention of this court by renewing their Petition for Writ of Mandamus.[69]

The Respondents persisted without evidence to support their allegations. They filed a third Petition ("Third Petition") seeking the issuance of a writ of mandamus directing the undersigned to appear as a witness in the Recusal Motion proceedings alleging he was the "sole available source [of] certain crucial evidence that lies at the heart of the pending Mo-

tions."[70] The District Court denied the Third Petition[71] and the Respondents re-filed the pleading as a new case.[72]

That petition was denied by the Order entered on December 26, 2006.[73] The District Court, citing *Cheeves v. Southern Clays, Inc.,* 797 F.Supp. 1570 (M.D.Ga. 1992), advised the petitioners as to their right to file a petition seeking a writ of mandamus *after* the issuance of a ruling on the Recusal Motion:

> In the instant petition, Petitioners seek a writ compelling Judge Briskman to reverse himself and rule in their favor on a motion which they suggest he should not have ruled on in the first instance. Their position is both inconsistent and wholly lacking in merit. The bankruptcy judge has not yet ruled on the Petitioners' recusal motion. Once a ruling is issued on that motion, Petitioners are not without a remedy. They have not presented a basis for mandamus relief in the instant petition.[74]

The Respondents, as admitted by Ginsberg, never renewed any of their petitions nor presented any evidence of an investigation to the District Court.[75] No appeal

---

**69.** *Id.* Doc. No. 23 at pp. 2–3 (*emphasis added*).

**70.** District Court Case No. 6:06–cv–01210–Orl–JA–KRS Doc. No. 24 at pp. 6, 10. The Respondents also attempted to compel the undersigned to appear as a witness through their appeal (District Court Case No. 6:06–cv–Orl–01867–JA) of the Court's October 30, 2006 Order (Doc. No. 1550) granting Evergreen's motion to exclude the undersigned as a witness. They filed a Motion to Stay Appeal requesting the appeal briefing schedule be stayed until a final determination was made on the Recusal Motion. The District Court's December 22, 2006 Order found the Exclusion Order to be an interlocutory order, denied the Appellants leave to appeal the Order, dismissed the appeal, and denied the Appellants' Motion to Stay Appeal as moot.

**71.** District Court Case No. 6:06–cv–01210–JA–KRS Doc. No. 25. The District Court denied the Third Petition on the basis: "... this is not an ongoing case in which such successive requests for relief may be filed. Rather, the prior petition was denied by this Court (Doc. No. 23), and that was the end of this 'case.' The Petitioners are seeking different relief on a new basis, and they must initiate a new filing." *Id.* Doc. No. 25 at p. 1.

**72.** District Court Case No. 6:06–cv–01807–JA–JGG Doc. No. 1.

**73.** *Id.* Doc. No. 3.

**74.** *Id.* at p. 3 (*internal citations omitted*).

**75.** Aug. 28, 2007 Hr'g Tr. vol. 2, p. 87–9.

or petition for a writ of mandamus, renewed or otherwise, was sought regarding the February 27, 2007 Order.

## III. SANCTIONS MOTIONS

### A. SANCTIONS TRIAL: *ORE TENUS* MOTIONS

Ginsberg made two *ore tenus* motions at the commencement of the sanctions trial. He made an *ore tenus* motion to have the Court disclose on the record:

> ... whether or not the Court was aware of a complaint being filed, and if so, when, and the extent to which the complaint involved any counsel in connection with this matter ... But in order for us to proceed in fact with this recusal motion sanctions hearing, we believe that the information is necessary and we would respectfully request under the *Cheeves* decision ... we would respectfully request the Court place on the record the Court's knowledge of the complaint and other matters.[76]

Ginsberg characterized the *ore tenus* motion as a "renewed motion" apparently considering it a renewal of his written Motion (Doc. No. 1694) requesting the undersigned Judge make certain disclosures on the record. Ginsberg established no basis for the relief requested and the *ore tenus* motion was denied.

Ginsberg then made an *ore tenus* motion to have the sanctions matter heard by the District Court asserting:[77]

> In a situation such as this, where the Court believes that it is personally under attack or has been personally maligned in some way, we believe that the law requires that the Court se[nd] this matter to another judge, an independent judge, a judge who's not influenced at all by the perceived attacks on the Court.[78]

Ginsberg established no basis for the relief requested. The *ore tenus* motion was denied and the trial proceeded.

Ginsberg's *ore tenus* motion to disclose and written Motion are reiterations of earlier attempts made by the Respondents to compel disclosure from the undersigned post-filing of the Recusal Motion. The Respondents listed the undersigned as a witness in their Disclosure of Time Estimates and Exhibits and Witnesses (Doc. No. 1520) filed during the pendency of the Recusal Motion proceedings. They asserted the undersigned was required to "either submit to testifying as a witness at trial or make a full disclosure on the record...."[79] An Order excluding the undersigned as a witness was entered on October 30, 2006 (Doc. No. 1550). The Respondents' appeal was dismissed by the District Court on December 22, 2006.[80]

Ginsberg submitted a letter to the Court dated January 19, 2007 (Doc. No. 1628) requesting the undersigned make disclosures and stating:

> If disclosure is made, the parties thereupon can simply file legal submissions arguing for an appropriate remedy or, alternatively, withdrawing the Motion, depending upon the disclosures themselves.

A separate written Order denying Ginsberg's *ore terms* motions and his written Motion (Doc. No. 1694) shall be entered contemporaneously.

76. *Id.* vol. 1, pp. 47–8.

77. *Id.* vol. 2, p. 51, ll. 2–5.

78. *Id.* vol. 1, pp. 50–3.

79. Doc. No. 1543 at p. 3.

80. District Court Case No. 6:06–cv–1867–Orl–JA–JGG, Doc. No. 8 (*see supra* n. 70).

## B. *PRIMA FACIE CASE* AND FORMS OF EVIDENCE

Evergreen established in the sanctions proceedings:

(i) A prima facie case the Respondents violated Rule 9011 in signing, filing, and advocating the Recusal Motion and sanctions are warranted.

(ii) The elements of 28 U.S.C. Section 1927.

(iii) It incurred fees of $631,266.00 and costs of $40,251.69 in defending the Recusal Motion, addressing the mandamus matters, and prosecuting the Sanctions Motions.[81]

(iv) The fees and costs it incurred as the result of the Respondents' violations are reasonable.

The parties presented various documents as exhibits and both sides requested the Court take judicial notice of the Evergreen bankruptcy and District Court proceedings and all of their docket contents. The Court, pursuant to Federal Rule of Evidence 201, took judicial notice of the dockets of the Evergreen Main Case, the Mataeka AP, the Involuntary Cases, the GrayRobinson AP, *R.W. Cuthill, Jr. v. Knight, et al.*, Adversary Proceeding No. 6:03–ap–00035–ABB (the "IPA AP")[82], the District Court mandamus proceedings, the Mataeka Judgment appeal, and the District Court Case No. 6:06–cv–1867–Orl–JA, including, without limitation, all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at, the hearings held in these cases.

GrayRobinson's, Vitucci's, and Spradley's primary evidence in defense of the Show Cause Order and the Sanctions Motions consists of the Affidavits of Spradley and Vitucci[83] and the testimony of Spradley, who testified on behalf of himself, Vitucci, and GrayRobinson. Ginsberg testified on behalf of himself and his firm.

The Affidavits asserted the Recusal Motion was filed in good faith, but did not set forth any facts supporting such assertion. The Affidavits did not articulate what specific events or facts led to the filing of the Recusal Motion, who was responsible for its drafting and filing, or what due diligence the Respondents conducted prior to filing the pleading. They primarily expressed Spradley's and Vitucci's profound regret over the results of the filing. The Affidavits did not establish the Respondents' actions in connection with the Recusal Motion were made in good faith.

The Respondents called Ginsberg and Spradley as witnesses. Ginsberg testified first.[84] His testimony was not credible. His answers were circular, elusive, and unresponsive. He gave lengthy, meandering responses to questions calling for a "yes" or "no" answer. His testimony was purposefully vague and largely devoid of substance. He provided no evidentiary or legitimate legal bases for the Recusal Motion allegations. He was hostile and argumentative when opposing counsel and the Court posed questions to him. His behav-

---

**81.** Aug. 28, 2007 Hr'g Tr. vol. 1, pp. 5–10; Evergreen's Exhs. A, B. Evergreen erroneously included Lubet's expenses of $908.48 in its fee calculation in Exhibit B instead of including it in the cost calculation. The total fee and cost calculation of $671,517.69 set forth in Exhibit B is correct.

**82.** Cuthill instituted this adversary proceeding against Knight, Huggins, APAM, and IPA seeking recovery of an alleged fraudulent transfer of approximately $213,000.00.

**83.** Doc. No. 1709.

**84.** Originally, GrayRobinson, Vitucci, and Spradley were going to rest on the Affidavits and not put on any testimony. *See* Aug. 28, 2007 Hr'g Tr. vol. 1, p. 44–5.

ior pushed the Court's patience resulting in stern admonishments.

Ginsberg's counsel incorporated the phrase "good faith" into virtually every question posed to Ginsberg and Spradley. Ginsberg incorporated the words "good faith" and "unequivocally" into virtually all of his responses. It appeared Ginsberg believed repetition and truth are synonymous. Repeatedly asserting the Recusal Motion was filed in "good faith" does not establish good faith.

## IV. RESPONDENTS' PRESENTATION

### A. "COMPLAINT" AND "INVESTIGATION" ALLEGATIONS

#### i. "Fact" Sources: Hudson and ATN Documents

Ginsberg testified the basis of the Recusal Motion was an alleged "investigation" of the undersigned by the Judicial Council stemming from a complaint filed against the undersigned by Hudson relating to the ATN case.[85] Ginsberg explained he first "received information in July 2006 ... that there seems to have been an Eleventh Circuit complaint filed against Judge Briskman"[86] and it involved "an ongoing investigation" by the Judicial Council.[87] This information, Ginsberg explained, gave rise to "an obligation to the client and an ethical obligation to the bar to file" the Recusal Motion.[88]

Ginsberg asserted repeatedly the Respondents made the "investigation" allegations in good faith. Ginsberg testified his source of "information" in July 2006 was Spradley and it was Spradley who characterized the matter as an "investigation" and "was doing everything he could to learn everything he could about this matter...."[89] Ginsberg further stated: "It was characterized as involving an ongoing investigation and that word was used not only in that first week but every time we had communications from people about the ATN complaint, that there was an investigation by the Eleventh Circuit."[90]

Ginsberg explained he understood an "investigation" was pending against the undersigned because the complaint had "been in existence" for such a long time:

Q: What information, if any, did you have that this matter was under review or investigation by the chief judge?

A: Well, our best and in fact our only source, first-hand source was from Mr. Hudson, the fact that Mr. Hudson had not been notified that it was dismissed and Mr. Hudson was clearly under the impression that it was being investigated.[91]

. . .

A: In fact the Eleventh Circuit was proceeding well over a year later with its investigation, it hadn't dismissed the complaint ... So the Eleventh Circuit

---

85. *Id.* pp. 114–15: Q: "... what was going on in your mind that you believed you had a good faith basis for filing that motion?" A: "Well, certainly the most important fact was that a reputable attorney was telling us that the Eleventh Circuit—an Eleventh Circuit complaint had been filed in the ATN matter, that a complaint was being investigated by the Eleventh Circuit, that it had not been summarily dismissed, and that [Hudson] would have been informed if it had been summarily dismissed. The attorney by all accounts was reputable and honest and serious."

86. Aug. 28, 2007 Hr'g Tr. vol. 1, pp. 59–60.

87. *Id.* p. 61, ll. 11–20.

88. *Id.* p. 59, ll. 15–25.

89. *Id.* p. 60.

90. Aug. 28, 2007 Hr'g Tr. vol. 1, p. 61.

91. *Id.* at pp. 79–81.

complaint no only was continuing, the investigation not only was continuing but was more encompassing in what information it could gather and the Eleventh Circuit was continuing its investigation.[92]

Ginsberg's "information" regarding the alleged Hudson complaint and investigation was entirely second-hand and hearsay. He implied he had numerous sources of information, making purposefully vague references to "people" and "members of the bar."[93] The cross examination of Ginsberg revealed his *only* source of information prior to filing the Recusal Motion was Spradley, who in turn had received information from Anthony and Hudson.

Ginsberg conducted no investigation prior to filing the Recusal Motion to determine if a complaint had actually been filed by Hudson or if a judicial investigation was pending.[94] He never had any communications with Hudson prior to filing the Recusal Motion.[95] He never saw the alleged complaint or any evidence of an "investigation." Neither Ginsberg nor Spradley

knew Hudson.[96] They had no prior knowledge of Hudson. Ginsberg believed Hudson and his firm were reputable based on Spradley's statements about Hudson's reputation and information found in Martindale Hubbell.[97]

Ginsberg's testimony regarding an "investigation" is contrary to Hudson's sworn averments.[98] Hudson testified at deposition his firm filed a complaint against the undersigned in the Eleventh Circuit Court of Appeals in connection with the ATN AP, he had some conversations with Spradley beginning in July 2006 regarding the complaint, and had one conversation with Anthony in which he confirmed a complaint had been filed.[99] Hudson testified he has never told anyone "that the 11th Circuit is investigating Judge Briskman as a result of the complaint."[100] Hudson had no communications with Ginsberg until *after* the Recusal Motion was filed.[101]

Hudson's deposition testimony was credible. He has been professional, discreet and believed he had a basis to file a judi-

**92.** *Id.* at pp. 83–4.

**93.** *Id.* at p. 61, ll. 6–9, 15–20; p. 70, ll. 24–5; p. 90, ll. 1–3, 25; vol. 2., p. 17, ll. 1–2; p. 22, ll. 12–15, 20–1.

**94.** Aug. 28, 2007 Hr'g Tr. vol. 1, p. 62, ll. 17–23.

**95.** *Id.* at pp. 67–68.

**96.** *Id.* at pp. 60, 67–8; vol. 2, p. 145, ll. 11–16.

**97.** *Id.* vol. 1, pp. 67–8. "Mr. Spradley confirmed to me that Mr. Hudson was a well respected attorney in Miami with not only a good practice but a good reputation … I had an absolute understanding not only based on what I know about law firms but based upon the information I was receiving secondhand from Mr. Hudson, that [the judicial complaint had] been thoroughly vetted."

**98.** Hudson, who lives and works in South Florida, was not present for the Sanctions Motions trial. His Affidavit and deposition

transcript were presented by the Respondents and admitted into evidence (Respondents' Exhs. X and EEE).

**99.** Respondents' Exh. EEE at p. 9, ll. 8–11, pp. 11–12, pp. 13–4.

**100.** *Id.* at p. 31, ll. 3–6.

**101.** Ginsberg's post-trial brief is inaccurate and misleading. He, in support of his assertion the "Respondents had a good-faith basis to assert in the Recusal Motion that an 'investigation' was pending," stated: "Ginsberg also testified that he spoke directly with Hudson, who used the term 'investigation' in connection with his description of the Complaint Proceedings." This statement is not true because Ginsberg had no direct contact with Hudson, as admitted by Ginsberg at trial, until after the Recusal Motion was filed. It is noteworthy the citation "Testimony of Ginsberg, p. 5" does not relate to Ginsberg's direct contact assertion.

cial complaint. He respected the confidentiality requirements of the Rules of the Judicial Council of the Eleventh Circuit Governing Complaints of Judicial Misconduct or Disability. He obtained a protective order from the United States Bankruptcy Court for the Southern District of Florida, Miami Division, based upon a subpoena *duces tecum* by Evergreen.

Hudson, despite being, as Ginsberg described, the Respondents' "best and in fact" "only source, first-hand source" [102] regarding the alleged judicial complaint and investigation and considered to be a reliable and credible witness, was not placed on the Respondents' witness list pursuant to the August 17, 2006 Scheduling Order.[103] The Scheduling Order required the parties to file their lists of witnesses, "including any expert witnesses and rebuttal witnesses," by September 6, 2006.

Ginsberg initially explained the non-inclusion of Hudson was an "oversight." He later explained Hudson was not listed as a witness because the Respondents believed "Judge Briskman was the best witness to tell us the status of the complaint." Ginsberg subsequently explained the Respondents never expected an evidentiary hearing to be conducted on the Recusal Motion:

> It never occurred to me, Mr. Lauro, that Judge Briskman would conduct evidentiary hearings … I think if Judge Briskman had made that disclosure, it's quite likely Mr. Spradley and I would not have pursued the matter … and if Judge Briskman had taken the other track and recused himself, again we

wouldn't have had an evidentiary hearing.[104]

These explanations are not credible.

Ginsberg's assertion an evidentiary hearing on the Recusal Motion would not be required to adjudicate the issues is objectively unreasonable. No reasonable attorney familiar with the Evergreen case and the applicable statutory and case law governing recusal matters would conclude an evidentiary hearing would not be conducted.

Ginsberg testified he reviewed the ATN AP pleadings, the ATN AP docket, and a transcript of ATN proceedings prior to filing the Recusal Motion and these documents formed the basis of the Recusal Motion.[105] Ginsberg presented no other documentary evidence in support of his contention the Recusal Motion was filed in good faith.

It was objectively unreasonable for the Respondents to rely on the ATN AP proceedings as a basis for the Recusal Motion. The ATN AP, as recognized by the District Court in its December 20, 2006 Order, is entirely unrelated to and has no relevance to the Evergreen case, the Evergreen adversary proceedings, or the Involuntary Cases. The ATN documents reviewed by the Respondents are not relevant.

#### ii. Asserted Legal Basis

Ginsberg testified the legal basis of the Recusal Motion:

> … was the standard set forth in the federal rules and federal statute about the objective appearance of partiality or lack of impartiality and the fact that there existed an ATN complaint that

---

**102.** Aug. 28, 2007 Hr'g Tr. vol. 1, p. 81, ll. 13–4.

**103.** Doc. Nos. 1510 (Scheduling Order), 1520 (Disclosure of Time Estimates and Exhibits and Witnesses).

**104.** Aug. 28, 2007 Hr'g Tr. vol. 1, pp. 124–5.

**105.** *Id.* at pp. 65–85; Respondents' Exhs. A–D, G.

had been filed a long, long period of time prior to the disqualification, that it was still pending, that it was still represented to us to be a serious matter under investigation by the Eleventh Circuit.[106] He asserted the Respondents were compelled by law to file the Recusal Motion because the Court did not disclose an "investigation" was pending and did not disclose alleged *ex parte* communications with Shuker.[107] Ginsberg explained he "researched and reviewed extensively what appeared to be a conflict of interest of having Mr. Shuker appear before Judge Briskman in our matter when Mr. Shuker in our mind was clearly a witness in the review being conducted by the Eleventh Circuit" [108]

Ginsberg asserted there was a clear appearance of partiality requiring disclosure:

> If Mr. Shuker in fact, and we were sure that he would be, was in fact a crucial witness in the Eleventh Circuit investigation relating to Judge Briskman's activities, Mr. Shuker would either at that point have been a favorable or an unfavorable witness to Judge Briskman, but one way or the other it seemed that from an appearance standpoint at the very least Judge Briskman would need to curry favor, or might curry favor with Mr. Shuker to ensure that Mr. Shuker's involvement in the Eleventh Circuit investigation was as favorable as possible to Judge Briskman.[109]

Ginsberg's statements had no basis in fact or law. The Respondents presented no evidence of an investigation by the Judicial Council. They presented no evidence of the Court directing or engaging in *ex parte* communications. It was objectively unreasonable for the Respondents to assert an appearance of partiality or any basis for recusal existed.

Ginsberg further asserted "the absence of disclosure from Judge Briskman" of the investigation provided additional "basis for the belief there was a complaint and also an investigation." [110] "The absence of disclosure" from the undersigned could not constitute a basis for the Recusal Motion. The Respondents made no request for disclosure upon the Court or raise any of the matters contained in the Recusal Motion prior to its filing. Ginsberg ultimately admitted no disclosure request was made upon the undersigned Judge before the Respondents filed the Recusal Motion.[111]

### Rules of the Judicial Council of the Eleventh Circuit

Ginsberg conceded that it was his understanding of the law at the time the Respondents filed the Recusal Motion that "the filing of the complaint itself does not trigger a requirement that the judge recuse himself." [112] Both expert witnesses testified at the Recusal Motion trial the mere filing of a judicial complaint does not constitute grounds for recusal.[113]

---

106. Aug. 28, 2007 Hr'g Tr. vol. 1, pp. 83–4.

107. *Id.* vol. 2, p. 14, ll. 13–18.

108. *Id.* vol. 1, pp. 86–7.

109. *Id.* at p. 87, ll. 15–25.

110. Aug. 28, 2007 Hr'g Tr. vol. 1, p. 86.

111. *Id.* at p. 94; Vol. 2, p. 65, ll. 13–15.

112. *Id.* vol. 2, p. 12, ll. 3–7.

113. Nov. 29, 2006 Hr'g Tr. vol. 1, p. 65, ll. 15–9; vol. 2, p. 13, ll. 3–9, p. 16. Respondents' Exh. No. 31(Report of Professor Lubet) in the Recusal Motion trial (¶¶ 7.b., 8.c.: "It is manifest under the terms of the *Judicial Conduct and Disabilities Act* that the filing of such a complaint is not sufficient to initiate an actual investigation of Judge Briskman ... Consequently, it has been virtually universally understood that the filing of a complaint under the *Judicial Conduct and Disabilities Act* does not disqualify a judge even from the subject-case itself, much less from an unrelat-

Ginsberg asserted the Respondents were not responsible for any inaccuracies in the Recusal Motion and "the law" required *the undersigned* to recognize any inaccuracies:

> If there was anything that was inaccurate in our complaint, in our motion, all that had to happen was Judge Briskman telling us that, making a record. That's all that had to happen, and that I respectfully submit that is what the law required of Judge Briskman.[114]

The Respondents failed to identify any such "law." Ginsberg's assertions have no legal support and are indefensible.

Ginsberg testified his review of the Rules of the Judicial Council of the Eleventh Circuit Governing Complaints of Judicial Misconduct or Disability ("Judicial Council Rules") formed a basis for filing the Recusal Motion. Ginsberg explained, pursuant to his reading of the Judicial Council Rules, if a judicial complaint is not "simply dismissed" an "investigation" is conducted, either by "the chief judge" or a "committee."[115] He explained the use of the word "investigation" was not "incorrect" "because it was an investigation. Whether it was the chief judge doing whatever he was doing or the committee doing whatever it was doing, it was an investigation."[116] He testified:

> A: I didn't know whether the chief judge was investigating on his own or whether the committee was investigating on its own, but my *unequivocal* understanding was that the complaint had passed through the first phase, that the chief judge had come to the conclusion

there was merit to the complaint, and that whether it was the chief judge or the committee, witnesses were going to be contacted, information was to be gathered. The presiding judge was going to be contacted and that information was going to be elicited from the presiding judge, and there was no more important witness in that investigation than Mr. Shuker.[117]

> Q: Well, Mr. Ginsberg, was it your understanding that the mere filing of the complaint triggers an investigation by the chief judge?

> A: No. My understanding was that the mere filing of a complaint triggered a review by the chief judge, but that in the vast majority of cases the chief judge in quite short order dismisses the complaint, informs—and this is an important factor—that under the rules the chief judge at that point informs the complainant that his review was that the complaint did not have merit. And the fact that Mr. Hudson believed and in fact you might say insisted the complaint was still being investigated meant to us and our review of the rules that the chief judge had not dismissed the complaint and that either the chief judge or the committee was investigating the complaint.[118]

Recusal of a federal judge in the Eleventh Circuit is governed by the Judicial Council Rules. The word "investigation" has specific, specialized meaning in the Judicial Council Rules. The filing of a judicial complaint does not necessarily lead to an investigation. The pendency of a

---

ed case."). The Respondents received a copy of Professor Lubet's report prior to the Recusal Motion trial.

114. Aug. 28, 2007 Hr'g Tr. vol. 2, p. 64, ll. 13–7.

115. *Id.* at p. 78; p. 90, ll. 11–21.

116. *Id.* at p. 122, ll. 4–11.

117. *Id.* at p. 79–80 (*emphasis added*).

118. Aug. 28, 2007 Hr'g Tr. vol. 1, pp. 79–80.

complaint does not mean an investigation is in progress. Ginsberg obtained the Judicial Council Rules from Spradley and read them prior to the filing of the Recusal Motion.[119] His explanation of judicial complaint procedure contradicts the plain, unambiguous language of the Judicial Council Rules.[120]

Ginsberg's "understanding" of the Judicial Council Rules and investigation procedure is indefensible. The Respondents' investigation allegations are entirely without factual or legal merit.

Ginsberg disregarded previous expert testimony contradicting his "understanding" of the Judicial Council Rules. Lubet explained the federal judicial complaint process is notoriously slow: "I think nationally the median figure is several months, but, of course, median means half [are] longer and I know also that there have been significant complaints about the length of time that it takes for chief judges to either proceed or dismiss these complaints."[121]

Ginsberg asked of Lubet during cross examination:

> And if you were to learn that the complaint had been filed almost a year ago and was still pending or being investigated, would that lead you to conclude—to reach a conclusion as to the merits or the seriousness of which the Eleventh Circuit was taking the investigation?

To which Lubet responded:

> It wouldn't because many cases unfortunately linger that way before they're dismissed. The House Judiciary Committee has held a series of hearing about complaints, over the delays and dismissing as a result of these matters.[122]

Ginsberg testified he consulted with "several people" including Harding as to "the propriety of filing the Recusal Motion"[123] and that he was advised by Harding "he had an ethical obligation to see this through."[124] Ginsberg testified "Justice Harding was *unequivocal* that there was an investigation. He used the term investigation."[125]

Ginsberg's testimony is purposefully misleading making it appear he had communications with Harding prior to the filing of the Recusal Motion and the pleading is based on Harding's opinions.[126] Harding was engaged by GrayRobinson *after* the Recusal Motion was filed.[127] Ginsberg did not have any communications with

---

**119.** *Id.* at p. 77, ll. 19–22; vol. 2, p. 20, ll. 18–22.

**120.** Ginsberg, interestingly, retreated from the word "investigation" in his post-trial brief (Doc. No. 1722). He discussed instead the "Judicial Complaint" and "Complaint Proceedings."

**121.** Nov. 29, 2006 Hr'g Tr. vol. 2, p. 47, ll. 3–9. Lubet further testified ninety-eight percent of federal judicial complaints are dismissed. *Id.* at p. 49, ll. 12–14.

**122.** *Id.* at p. 50, ll.1–10.

**123.** Aug. 28, 2007 Hr'g Tr. vol. 1, pp. 90–1.

**124.** *Id.* at p. 122, ll. 12–23.

**125.** *Id.* at p. 92, ll.4–5 (*emphasis added*).

**126.** *Id.* vol. 2, pp. 16–7: "And all of the information that we gathered from the papers about that ongoing investigation and the seriousness of it was corroborated by Mr. Hudson and corroborated by our own review of the facts and our legal analysis was supported and solidified by the advice we received from Justice Major Harding and other counsel with whom we had discussions."

**127.** Aug. 28, 2007 Hr'g Tr. vol. 1, p. 118, ll. 13–21: "Q: Now *after* filing the motion, did you do anything in terms of a continued analysis as to whether or not you were justified in continuing to pursue the motion? A: Yes, we did. We consulted with and ultimately retained Justice Harding."

Harding until *after* the Recusal Motion was filed.[128] Ginsberg was not involved in the initial communications with Harding and was later involved merely as a by-stander.[129] He met Harding only once.[130]

Harding had no evidence of an investigation:

> All I know is that a complaint was made and the rules provide for the chief judge to take some action . . . [131]
>
> . . .
>
> I'm not aware of any—whatever has proceeded since the complaint was made. I make, as I indicated earlier, I make my assumption based upon the chief judge's responsibility under the rules.[132]

Harding's assumption an investigation was pending was fundamentally flawed. The existence of a complaint does not mean an investigation ensues.

Spradley testified the word "investigation" as used in the Recusal Motion was not meant to have any special meaning: ". . . I didn't hone in on the word investigation at the time. To me the prime focus at the time was the pending complaint and, you know, that was it. To me the word investigation didn't add anything more to it." [133] He explained the Respondents' usage of the word was based upon a dictionary definition, not the Judicial Council Rules:

> . . . we looked it up in the dictionary before, during and after. An investiga-

tion, its first meaning in Webster's, you know, is factual pursuit to the truth and my focus, just my personal state of mind, while I understand the Court's concern of the use of that word, mine was not one of being malicious. It was a, in my view, a pending complaint for many, many months. Then it's pending because it's the process and the word investigation was used, but I certainly didn't intend in the sense of, you know, the comprehensive study and all that being done. My focus was on the pendency of the complaint, and that's what Mr. Hudson said to me. All I did was repeat those words. . . . [134]

Spradley stated Ginsberg was "persuasive" in the application of the law. Ginsberg and Spradley never saw or asked to see Hudson's alleged complaint. They never asked for or saw a letter acknowledging the filing of a judicial complaint by Hudson or a letter appointing a special committee to investigate the judicial complaint. Neither Ginsberg nor Spradley discussed the Judicial Council Rules with Hudson.

Ginsberg did not ask Spradley to discuss the Judicial Council Rules with Hudson or inquire if Hudson received any notices issued pursuant to the Judicial Council Rules.[135] A reading of the Judicial Council Rules would have shown the proof the Respondents needed to establish the existence of an investigation. Despite the plain and unambiguous language of the

---

128. *Id.* at pp. 91, 118–19; vol. 2 at p. 34, ll. 11–14; p. 60, ll. 9–11 ("Q: You hadn't talked to Justice Harding when you wrote this on Page 23, had you? A: No.").

129. Aug. 28, 2007 Hr'g Tr. vol. 1, p. 188, ll. 19–25; vol. 2, p. 34, ll. 1–14.

130. *Id.* vol. 1, p. 122, ll. 15–17.

131. Nov. 29, 2006 Hr'g Tr. vol. 1, p. 62, ll. 2–4.

132. *Id.* at p. 64, ll. 16–9.

133. Aug. 28, 2007 Hr'g Tr. vol. 2, p. 129, ll. 18–22.

134. *Id.* at p. 137, ll. 6–19.

135. Aug. 28, 2007 Hr'g Tr. vol. 2, pp. 30–32, 63–65, 153–55.

Judicial Council Rules the Respondents failed to request the essential information establishing their investigation allegations.

Ginsberg testified he relied on articles and case law in preparation of the Recusal Motion: "The articles that we read and the case law that I reviewed talked about a witness currying favor or a lawyer currying favor with a judge in similar circumstances." [136] "I reviewed all the cases we cited in our motion papers." [137]

The case law cited by the Respondents in the Recusal Motion and mandamus petitions relates to criminal matters. The case law cited is inapposite, inflammatory and incorporating it into the Recusal Motion was inappropriate. Ginsberg posed questions to Harding during the Recusal Motion proceedings relating to criminal matters. The questions were inapposite and inflammatory. [138]

### iii. "Fact" Source: John Anthony

Ginsberg did not identify in his direct examination how the Respondents learned of Hudson's complaint. It was eventually revealed they learned of Hudson's complaint through Anthony. Anthony had a conversation with Hudson in July 2006 during which Hudson confirmed he had filed a judicial complaint against the undersigned relating to the ATN AP. [139] Anthony sent an email to Spradley on July 7, 2006 stating there was a complaint pending against the undersigned, "the investigation is supposedly open," and asked Spradley to call him. [140] Spradley telephoned Anthony and Anthony suggested he contact Hudson. Spradley telephoned Hudson and Hudson confirmed he had filed a complaint against the undersigned. [141]

Spradley confirmed Anthony and Hudson were the Respondents' only sources of information regarding the alleged "investigation." [142] He testified he did not "know if John Anthony used the word investigation, but he identified Hudson to me." [143] Anthony's deposition revealed he did use the word "investigation." Spradley has never seen the alleged complaint and has no first-hand knowledge of it. [144]

Spradley knew he was obligated to share the Anthony and Hudson communications with Ginsberg and the Clients:

> And at that point, I had another tough decision. I knew my clients were already upset. They felt that not only

136. *Id.* vol. 1, p. 87, ll. 11–14.

137. *Id.* at p. 90, ll. 6–7.

138. Nov. 29, 2006 Hr'g Tr. vol. 1, pp. 36, ll. 19–25; p. 37, ll. 1–15. Ginsberg asked Harding: "In your opinion would an alteration of a transcript potentially be considered a violation of 18 USC, Section 1506[of the federal criminal code]." To which Harding replied, "I would think so." *Id.* at p. 37. Harding had no knowledge of any transcript being altered or destroyed. *Id.* at pp. 92–3. No such matters were alleged in the Recusal Motion.

139. Respondents' Exh. EEE at p. 9, ll. 8–11, pp. 11–12, 13–4.

140. Aug. 28, 2007 Hr'g Tr. vol. 1, pp. 117–18. Spradley did not initially reveal the source of the July "communication," but confirmed the source was Anthony (*Id.* at p. 119, ll. 7–8). Respondents' Exh. II at p. 43, ll. 9–12 (Q: "Okay. Did you ever communicate to Mr. Spradley that you believed that there was an investigation or a judicial complaint regarding Judge Briskman's handling of the ATN case?" A: "Yes."); p. 44, ll. 3–9; pp. 50–3.

141. Aug. 28, 2007 Hr'g Tr. vol. 1, p. 119. Spradley testified his communications with Anthony, Hudson, and Ginsberg all occurred on the same day.

142. *Id.* at p. 136, ll. 9–14.

143. *Id.* at p. 136, ll. 19–21.

144. Dec. 11, 2006 Hr'g Tr. p. 51.

were they losing the litigation but they felt there was something else going on which to that point, as I said, each of the incidents, while they were accumulating and the temperature is very high, I still didn't feel that there was an analysis of recusal that was warranted. So I knew that once I—if I were to give that information to the clients and Mr. Ginsberg, I expected the temperature would go way up at that point. And I thought about it and I gave it consideration and I concluded that I had a duty to pass that information along ... And then—I did.[145]

Spradley hesitated in sharing the communications with Ginsberg and the Clients because he knew it would be incendiary. Ginsberg and the Clients were upset with how the Involuntary Cases were proceeding and the temperature immediately rose when they learned of the communications. Ginsberg started drafting the Recusal Motion the same day Spradley shared the communications with him.[146]

Spradley explained the "information" obtained from Anthony and Hudson made the Clients feel "that there was an appearance of bias" and "confirmed to them that they just felt they weren't getting a fair shake and that sort of thing." [147] He stated the alleged complaint in the ATN matter "weighed heavily on the minds of Mr. Knight and Mr. Huggins and without that

[the Recusal Motion] would not have been filed." [148]

Spradley testified Ginsberg suggested the filing of a recusal motion and, after much deliberation, Spradley elected to join in the filing of the motion.[149] He testified that, while Ginsberg recommended and the Clients directed the filing of the Recusal Motion, he required additional time for consideration.[150]

Anthony is the epicenter of the Recusal Motion. His email to Spradley started a chain reaction leading to the filing of the Recusal Motion. His communications to Spradley had no basis in fact and were nothing more than scandalous, unfounded gossip. His actions were irresponsible and unprofessional.

#### iv. John Anthony's Deposition

Anthony was deposed by Evergreen on November 10, 2006. Ginsberg appeared at the deposition and interposed objections to Evergreen's questions.[151] Anthony was questioned about each line of his July 7, 2006 email to Spradley. He admitted he had no "firsthand knowledge that there was an investigation open" and no firsthand knowledge of any of the statements made in his email communication to Spradley.[152] All of his "knowledge" was "second and third hand." [153]

Anthony, asserting attorney-client and work product privileges, refused to answer the question whether he suggested to

---

**145.** Aug. 28, 2007 Hr'g Tr. vol. 2, p. 118, ll. 9–25.

**146.** Evergreen's Exh. C.

**147.** Aug. 28, 2007 Hr'g Tr. vol. 2, p. 119, ll. 18–22.

**148.** *Id.* at p. 129, ll. 8–10.

**149.** *Id.* at p. 120, ll. 5–15.

**150.** *Id.* at pp. 120–21.

**151.** It is unclear in what capacity or pursuant to what authority Ginsberg appeared and interjected objections. Respondents' Exh. II at p. 21. Anthony stated "I don't know whether I'm [Ginsberg's] witness or not" to which Ginsberg replied, "I'm not instructing you, but I don't think it's appropriate to speculate in a deposition."

**152.** Respondents' Exh. II at p. 53, ll. 22–24; pp. 53–6, 60.

**153.** *Id.* at p. 62.

Spradley he contact Hudson regarding the alleged judicial complaint.[154]

Anthony testified he did not ask Hudson if Hudson had filed a judicial complaint against the undersigned.[155] Hudson testified at deposition Anthony asked him whether he had filed the complaint: "I was walking to get in a cab and [Anthony] was walking wherever he was walking, and that's when he asked me if I was the one that had filed the Briskman complaint, and I said I was." [156] Anthony stated Hudson's testimony is "inaccurate." [157]

Anthony had no first-hand knowledge of a judicial complaint or an investigation.[158] He would not disclose who informed him an alleged complaint had been filed against the undersigned:

Q: Do you have knowledge of the alleged [judicial] complaint?

A: I do.

Q: And how did you gain that knowledge?

A: I cannot specifically remember. I know that it wasn't through Mr. Hudson.

. . .

Q: And how did you come to gain this knowledge?

A: I work with hundreds of lawyers, and I have no recollection. I know that many, many lawyers knew about that case ... The time period wherein I would have heard that that became the alleged complaint, as you've termed that, I also can't recall ...

Q: Okay. And those discussions where you said you had learned of something

regarding ATN would have been with other lawyers or—

A: Undoubtedly. It was undoubtedly with other lawyers. It falls into the realm of what you and I both realize is bankruptcy lawyer gossip, and you and I have hear a lot of that.

. . .

Q: Give me the name of an attorney.

A: I don't have specific names.

Q: Not one name, not one attorney who told you this?

A: No.

Q: So your opinion comes merely from gossip, but you can't identify who that gossip—

Mr. Ginsberg: Objection.

A: It's not an opinion, and that, I think, is a legal term. It's "have you heard?" Yes, I have.

Q: But you don't know from whom?

A: Right.[159]

Anthony concluded his July 7, 2007 email to Spradley with the statement, "If I'm wrong on these threshold factual allegations, I would be very surprised, very surprised." In response to the question what led Anthony to believe he was right, Anthony responded:

... because, I mean, this is something that I think you realize has a lot of— there are a lot of lawyers who seem to know a lot about the way that [ATN AP] hearing went, whether or not they know it firsthand, you know? And it's like Brittany Spears' divorce or something.

154. *Id.* at pp. 44–49.

155. *Id.* at p. 35, ll. 7–10.

156. Respondents' Exh. EEE at p. 12, ll. 4–7.

157. Respondents' Exh. II at p. 35, ll. 11–14

158. *Id.* at p. 58, ll. 6–12; p. 60, ll. 8–14.

159. *Id.* at p. 30, ll. 22–25; p. 31, ll. 1, 13–25; p. 32 5–8; p. 33, ll. 4–10; pp. 58–9.

A lot of people have heard a lot. If you hear the same thing from multiple lawyers, you tend to think that there's probably something to it.[160]

There was conflicting testimony as to whether Anthony was involved with preparation of the Recusal Motion. Ginsberg testified Anthony "was part of the process at GrayRobinson that vetted this motion before it was filed ... I know that Mr. Anthony reviewed these papers and endorsed them based upon his knowledge."[161] Anthony denied having any involvement with the Recusal Motion.[162]

Anthony had no knowledge of a judicial complaint or an investigation by the Judicial Council. His information, at best, was equivalent to tabloid gossip. No reasonable attorney would rely on such information as a basis for a recusal motion.

The Respondents did not conduct a reasonable pre-filing inquiry of the allegations contained in the Recusal Motion regarding Hudson's complaint and an investigation by the Judicial Council. They conducted no reasonable inquiry into the facts and law regarding these allegations. It was objectively unreasonable for the Respondents to allege a complaint and an investigation by the Judicial Council were pending against the undersigned. Such allegations were made with no factual or legal support. The allegations were made in bad faith.

## B. "EX PARTE" 46–PAGE FOFCOL ALLEGATIONS

Ginsberg's assertion the alleged "investigation" was the basis of the Recusal Motion contradicts the content and prosecution of the Recusal Motion, in which alleged *ex parte* communications were a primary focus of the Respondents.

The Court, at the mid-point of the Mataeka AP trial, sent an email to the parties inviting them to file proposed findings of fact and conclusions of law ("FOFCOL") not to exceed fifteen pages in length.[163] The purpose of the invitation was to prompt the parties to focus their cases and evaluate what evidence was relevant for the remainder of the trial. The parties submitted FOFCOL at the trial mid-point and at the trial's conclusion.

The Respondents devoted a substantial portion of the Recusal Motion to allegations the Court "directed" and engaged in *ex parte* communications with Shuker in connection with the 46–page FOFCOL and the entry of the Orders to Compel in the Knight and Huggins involuntary cases. They made the *ex parte* allegations a significant part of the Recusal Motion trial with more than half of the examination questions (55%) relating to those allegations. The *ex parte* allegations constituted a significant portion of the Respondents' mandamus petitions.

Ginsberg attempted to shift the focus away from the *ex parte* allegations and downplay their central role in the Recusal Motion proceedings.[164] He distanced him-

---

160. Respondents' Exh. II at pp. 56–7.

161. Aug. 28, 2007 Hr'g Tr. vol. 1, pp. 92–3.

162. Respondents' Exh. II at pp. 12–14, p. 68, ll. 16–9.

163. The email sent June 20, 2005 from the Court's Courtroom Administrator to Shuker, Spradley, and Ginsberg stated: "Good Afternoon, Judge Briskman would like the parties to submit any pending objections to the Christine Butler transcript within 14 days. You are

also invited to file Findings of Fact Conclusions of Law not to exceed 15 pages, double spaced. The court would also like each of you to provide dates from now until the end of the year that you would not be available for concluding the hearing on this matter."

164. *See, e.g.,* Aug. 28, 2007 Hr'g Tr. vol. 1, pp. 104–5: "Judge, you shouldn't recuse yourself simply because of Mr. Shuker's oversized brief either. That's not the basis for our recusal."

self from the *ex parte* allegations by laying responsibility for them at Spradley's feet, just as he did with the "investigation" allegations:

A: My understanding was that the Court directed each of the parties to file with the

Court a fifteen page submission, that it was clearly stated to me in response to a request that I made that the parties were not to exchange these submissions, and it was unequivocally stated to me that it was at the Court's directive ...

All I know is I was told that it was a directive.

Q: By whom?

A: By Mr. Spradley.

Q: Did you communicate directly with the Court to determine whether or not that was the procedure the Court requested.

A: No.[165]

Ginsberg testified he had "two pieces of evidence," other than what Spradley told him, establishing the Court ordered the *ex parte* FOFCOL: "One is my best recollection that the Judge actually said that in open court" and his "recollection" an email was published in open Court by Mr. Shuker in which "it was clear the Court was directing the fifteen page submission *ex parte*." [166] Ginsberg did not and could not produce any transcript or email corroborating his "recollections."

Spradley testified the alleged directive was "a matter of perception." [167] He "in-

terpreted" the Court's invitation for the parties to file briefs at the mid-point of the Mataeka AP trial as not a "voluntary thing":

I took it to mean we needed to do it. You know, I spoke with Scott Shuker about it. I had a perception and I had a perception that he had the perception that we were to submit it blindly but that was the implication. And I believe he testified that we agreed it would be but my memory was that that was our perception.[168]

Spradley conceded during the Recusal Motion trial the Respondents' *ex parte* allegations were based on an "impression" and not fact.[169]

The Respondents' *ex parte* "perceptions" and "impressions" are contrary to the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, and the Local Rules of this Court. These rules require all pleadings, which include proposed orders and FOFCOL, to be served on opposing counsel.[170]

Email communications between Shuker and Spradley during the Mataeka AP reveal Spradley knew Evergreen had mistakenly filed the 46–page FOFCOL, had submitted a fifteen-page FOFCOL substitution to correct the error, and the Court had not reviewed Evergreen's initial submission. Their email communications establish the submission of the 46–page FOFCOL was a resolved issue as of November 4, 2005.[171]

---

**165.** *Id.* at pp. 95–96.

**166.** *Id.* vol. 2, p. 49, ll. 4–18.

**167.** Aug. 28, 2007 Hr'g Tr. vol. 2, p. 133, ll. 19–20.

**168.** *Id.* at p. 131.

**169.** Dec. 11, 2006 Hr'g Tr., p. 137, ll. 22–5.

**170.** Feb. 27, 2007 Order at pp. 48–9.

**171.** *See* Feb. 27, 2007 Order at p. 36. Spradley wrote to Shuker on October 10, 2005: "Scott, for crying out loud—my side spent hours, and I mean MANY hours—tailoring [*sic*] our submission to 15 pages pursuant to the Court's request ... but I'm having trouble dealing with the page overage issue. The clients feel we got short changed on our submission—and my vouching for you and your reputation in rebuttal to my own clients is

Ginsberg and the Clients were aware, at the time the Recusal Motion was filed, of Spradley's and Shuker's email communications that the Court had not reviewed the 46-page FOFCOL. Spradley testified "... I did explain that and, you know, *it wasn't received well from the clients or Mr. Ginsberg* that that was accepted as absolute, that you know, that was true." [172]

The Respondents were aware as early as October 2005 Evergreen had substituted a corrected fifteen-page FOFCOL for the 46-page FOFCOL and the Court had not reviewed or used the 46-page FOFCOL, yet they waited ten months to file the Recusal Motion. No party alerted the Court to any issues or sought clarification of any "perceptions" or "impressions" concerning the Court's invitation to submit FOFCOL.

The Respondents themselves violated the fifteen-page submission limitation by filing a twenty-three-page FOFCOL and

manipulating its formatting.[173] Ginsberg, despite the finding previously made in the February 27, 2007 Order that the Respondents violated the fifteen-page limitation, testified the Respondents complied with the page limitation.[174] Such testimony is inconsistent with the Court's directives, the rules, and the documents themselves. No factual or legal basis exists for Ginsberg's statement.

Harding testified on direct examination the Court had engaged in *ex parte* communications regarding the 46-page FOFCOL. His opinion was based upon his assumption the Court had reviewed the 46-page FOFCOL and the analysis of the 46-page FOFCOL created by the Respondents in which they underlined words and phrases they believed overlapped with the Mataeka Judgment.[175]

The Respondents failed to share crucial facts with Harding. They failed to inform him Evergreen had submitted a replace-

---

being received in less than favorable fashion. This [*expletive deleted*]. Please explain."

Shuker responded by email on October 17, 2005: "Anyhow, enjoy the proposed findings and use them in good health. [To] that end, I understand that you called [the Courtroom Deputy] about the page [length] and were informed the Judge has not yet looked at either proposed findings. Thus, it seems the simple solution is for me to cut mine down to 15 pages and replace the longer one. I assume you are fine with this and simply ask until 11/7 to submit such. Let me know your thoughts."

Shuker sent an email to Spradley on November 3, 2005 stating: "... By the way, we submitted revised FOF/CL today which were 15 pages; the Judge never reviewed the longer one. Thus, I assume that is now a moot issue." Spradley responded by email on November 4, 2005 discussing the scheduling of witnesses and concluding: "... Thanks for the note re: findings and conclusions. I'll call you in a while."

**172.** Aug. 28, 2007 Hr'g Tr. vol. 2, p. 133, ll.2–11 (*emphasis added*).

**173.** *See* Feb. 27, 2007 Order at p. 39 (*citations omitted*) in which the Court found: "The Movants violated the fifteen-page limitation." They manipulated their document formatting just as Evergreen manipulated its document formatting. Their submissions utilize an eleven-point font, have side margins of one inch, and have top and bottom margins of .8 inches. Their Citations of Record, consisting of eight pages, constitutes conclusions of law. The content of the Citations of Record is part of the Movants' Final FOFCOL. The Movants' December 2005 submission constitutes a total of twenty-three pages. Spradley conceded the submission allowed the Movants to exceed the fifteen-page limitation: "Well, we did get extra words. We wanted, you know, because the first set of submissions didn't have any citations.'"

**174.** Aug. 28, 2007 Hr'g Tr. vol. 1, p. 96, ll. 16–21.

**175.** Nov. 29, 2006 Hr'g Tr. vol. 1, p. 54.

ment fifteen-page FOFCOL [176] and they did not give him a copy of the fifteen-page FOFCOL.[177] They failed to share with Harding the email communications evidencing Spradley knew Evergreen had submitted a replacement FOFCOL and the Court had not reviewed the 46–page FOFCOL.[178]

Harding's opinion the Court had engaged in *ex parte* communications was founded upon faulty assumptions formed from incomplete, withheld information. Harding admitted the omitted information was relevant and he would have no basis to opine the Court had engaged in *ex parte* communications had he known Evergreen submitted a 15–page replacement FOFCOL and the Court had never reviewed the 46–page FOFCOL.[179]

The Respondents presented no evidence the Court directed or suggested *ex parte* communications. They knew the Court at no time directed or suggested any *ex parte* communications be made, received or reviewed, yet they made allegations to the contrary. The Respondents conducted no reasonable inquiry into the facts and law. It was objectively unreasonable for the Respondents to allege the Court engaged in or directed *ex parte* communications in the Mataeka AP. The allegations relating

to the *"ex parte"* 46–page FOFCOL were made with no factual or legal support and were made in bad faith.

## C. *"EX PARTE"* ORDERS TO COMPEL ALLEGATIONS

The Respondents alleged in the Recusal Motion the Court engaged in *ex parte* communications with respect to the entry of the Orders to Compel. Ginsberg explained the basis for the allegation was the discovery papers were "never served on [him] ... and I believe it had not been served on Mr. Spradley either, and I thought, you know, that again was another instance of communications that certainly again raised a red flag." [180]

Email communications between Shuker and the Respondents reflect the Respondents could not have been surprised by the filing of the Emergency Motions to Compel in the Knight and Huggins involuntary cases.[181] The Certificate of Service attached to the Emergency Motion to Compel filed in the Knight involuntary case indicates Ginsberg was sent a copy of the pleading by electronic transmission, facsimile, and first-class mail on July 17, 2006.[182]

176. *Id.* at p. 55, ll. 12–25; p. 56, ll. 1–3 ("I did not know that.").

177. *Id.* at pp. 54–5; p. 57, ll. 5–15; pp. 58–9.

178. *Id.* at p. 55–7; pp. 127–31.

179. Nov. 29, 2006 Hr'g Tr. vol. 1, p. 55, ll. 5–11; pp. 59–60; p. 129.

180. Aug. 28, 2007 Hr'g Tr. vol. 1, p. 111, ll.17–23; p. 112, ll. 7–10.

181. *Id.* The email communications attached to Evergreen's Emergency Motions reflect the Respondents and Evergreen were discussing the coordination of expedited discovery in the involuntary matters. Shuker suggested the

additional documents Evergreen intended to request be produced "at least 2 business days prior to the hearing [on the involuntary petitions]." Spradley responded, with a carbon copy to Ginsberg: "We will not agree to expedite discovery concerning the involuntary cases. I could elaborate but the bottom line is that my client and Peter's have already participated in substantial discovery and thus aren't interested in continuing the burdensome process unless they are required to do so. Certainly, they will participate to the extent required, but there is nothing pending presently." Case Nos. 6:06–bk–01546–ABB and 6:06–bk–01547–ABB Doc. Nos. 14.

182. *In re Jon M. Knight,* Case No. 6:06–bk–01547–ABB, Doc. No. 14.

This Court found previously in the February 27, 2007 Order service was not required to be made on Ginsberg. Vitucci had been designated by the Respondents as the person to be served in the *pro hac vice* motion they filed in the Mataeka AP.

The Respondents were provided an opportunity to appear at a hearing on Evergreen's motions to compel discovery, they declined to have an attorney available, and the Court, after reviewing the matter, entered the Orders to Compel.[183] Spradley does not dispute those findings and accepts "what happened." [184]

Ginsberg shunned responsibility for the *ex parte* communication allegations stating he had no personal knowledge of the facts and circumstances relating to the entry of the Orders to Compel and had relied upon Spradley for the relevant information.[185]

The Orders to Compel did not grant extraordinary relief. They: (i) granted Cuthill's emergency motions; and (ii) directed the parties to "provide opposing counsel all exhibits and evidence to be offered at the hearing and qualifications and scope of testi[mony] of any expert witness" by July 24, 2006, two days prior to the scheduled trial on the Knight and Huggins involuntary petitions.[186] The proposed orders submitted by Shuker were not entered as the Respondents alleged. The proposed orders were reviewed. The Court drafted and entered the Orders to Compel.

The Respondents, in preparing and presenting the Recusal Motion, deliberately ignored facts evidencing the Court did not direct or engage in *ex parte* communications, their violation of the fifteen-page limitation in the Mataeka AP, and failed to make an attorney available for the discovery matters in the Involuntary Cases.

The Respondents presented no evidence the Court directed or suggested *ex parte* communications. The Court at no time directed or suggested any *ex parte* communications be made, received or reviewed. The Respondents conducted no reasonable inquiry into the facts and law. It was objectively unreasonable for the Respondents to allege the Court engaged in or directed *ex parte* communications in the Involuntary Cases. The allegations relating to the "*ex parte*" Orders to Compel were made with no factual or legal support and were made in bad faith.

## D. DISQUALIFICATION ALLEGATIONS

Ginsberg and Spradley fleetingly addressed the disqualification allegations

---

**183.** This matter was addressed at length in the February 27, 2007 Order at pp. 26–8 (*footnotes omitted*): "A [Gronek & Latham] attorney served the emergency motions on GrayRobinson by electronic transmission, facsimile, and first-class mail, on Huggins and Knight by first-class mail, and on the Chapter 7 Trustee by facsimile and first-class mail. Coberly, at the Court's direction, called GrayRobinson on July 18th to schedule a hearing on the emergency motions for either July 18th or July 19th and spoke with Vitucci. Spradley was on vacation and not available to appear for a hearing. Another GrayRobinson attorney could have appeared for Spradley, but no attorney was made available. GrayRobinson did not file a response to the emergency motions. The Court reviewed the motions and entered Orders on the papers on July 19,

2006." The Court concluded: "The Court did not engage in *ex parte* communications in the involuntary cases. The Movants have failed to establish any improprieties regarding the emergency discovery motion proceedings."

**184.** Aug. 28, 2007 Hr'g Tr. vol. 2, p. 117, ll. 10–20.

**185.** *Id.* vol. 1, p. 112, ll. 11–25.

**186.** *Id.* The Notices of the Appointment of the Interim Trustee in the Knight and Huggins involuntary cases were issued on July 17, 2007 and the Notices setting the evidentiary hearings on the involuntary petitions for July 26, 2007 were issued the following day.

made in the Recusal Motion against Shuker. Ginsberg described Shuker's actions at the deposition of the expert witness Charles Baron as "bad behavior" not warranting Court involvement at the time the events occurred.[187] Ginsberg explained Shuker's actions complained of in the Recusal Motion "were invoked ... as evidence to—as to why we believed that partiality may have in fact played out, not in particular with regard to any rulings by Judge Briskman, but specifically as they evidenced Mr. Shuker's apparent belief that he could act in ways that were clearly inappropriate." [188]

Ginsberg attempted to absolve his behavior at the Charles Baron deposition: "I think the transcript reflects and certainly the facts reflect that it wasn't that I was interfering with any questioning but simply trying to have some sort of semblance of professionalism during Mr. Baron's deposition." [189] The transcript and the facts reflect Ginsberg acted improperly at the deposition and such conduct could be inconsistent with the Florida Rules of Professional Conduct.[190]

Ginsberg retreated from the allegations the Court "empowered" Shuker to engage in certain behavior and "endorsed" and gave "a judicial nod" to Shirker's actions.[191] He refused to admit the Respondents' had made allegations of an inappropriate relationship between Shuker and the undersigned, but explained they had not produced any evidence of such a relationship because they "didn't believe it was necessary to provide evidence of an illicit relationship." [192] Ginsberg had previously admitted in his January 19, 2007 letter to the Court no inappropriate relationship existed between the Court and Shuker.[193]

The Respondents did not seek disqualification of Shuker and his firm when the alleged unethical conduct occurred. They conceded his conduct did not constitute a basis for recusal. It was objectively unreasonable for the Respondents to allege Shuker engaged in conduct requiring his and his firm's disqualification and to seek recusal of the undersigned based on such conduct. The allegations regarding Shuker's conduct were made in bad faith.

### E. RESPONDENTS' ASSERTIONS

#### i. The Recusal Motion was not based on unfavorable rulings.

The Respondents contend unfavorable rulings were not an impetus for the Recusal Motion.[194] The Recusal Motion itself

---

187. Aug. 28, 2007 Hr'g Tr. vol. 1, p. 102–3. Charles Baron was the defendants' expert witness in the Mataeka AP and Shuker deposed him on August 9, 2005. Spradley and Ginsberg were present.

188. Aug. 28, 2007 Hr'g Tr. vol. 1, pp. 106–7.

189. *Id.* at p. 102, ll. 12–16.

190. Feb. 27, 2007 Order at p. 31.

191. The allegations are found in the Recusal Motion at pp. 10, 26. Aug. 28, 2007 Hr'g Tr. vol. 2, pp. 52–8.

192. *Id.* at pp. 53–4. *See, e.g.:* Q: "But you did allege an improper relationship in your Recusal Motion, didn't you?" A: "Can you point to what you're referring to?" Q: "I will. But do you recall one way or the other, do you even recall whether or not you alleged an improper relationship?" A: "What I recall was it was inappropriate not to make a disclosure ...."

193. Doc. No. 1628: "However, we do not believe that any evidence has been entered regarding a relationship between your Honor and Mr. Shuker that show that you endorsed such actions, and thus believe that, although the activities were inappropriate, they do not serve as a basis for the relief requested by the Motion."

194. Aug. 28, 2007 Hr'g Tr. vol. 1, p. 106, ll. 12–17; vol. 2, pp. 53–8.

and the Respondents' subsequent related pleadings establish the Recusal Motion was based on the Clients' and the Respondents' displeasure with unfavorable rulings. The extraordinary relief requested of "revocation of all Orders previously entered in all matters in this case and all other adversary proceedings, contested matters and related cases in which the Movants are parties and further relief as this Court deems just and equitable" [195] evidences the Respondents' and Clients' intense displeasure with the Court's rulings.

They sought through the Recusal Motion to undo *every* order entered involving the Clients going back to 2001. They sought this same relief in their mandamus petitions. The docket for the Evergreen case alone had 1,507 entries at the time the Recusal Motion was filed and more than 250 orders had been entered in Evergreen matters.

The Respondents attacked the Court's rulings in the Recusal Motion:

(i) Insufficient evidence was presented to establish the need for the appointment of an interim Trustee in the Knight and Huggins involuntary cases. (ii) The expedited discovery orders should not have been entered in the Huggins and Knight involuntary cases. (iii) The Court failed to properly address automatic stay issues in the involuntary cases. (iv) The Mataeka Judgment contains "approximately 95 findings of fact and conclusions of law that either are totally without support in the record or directly contrary to the evidence at trial." [196] (v) The Mataeka Judgment dam-

age award was miscalculated and inflated to benefit Shuker and Cuthill.[197]

These grievances are not the proper subject for a recusal motion, but are matters that should have been addressed through timely filed motions for reconsideration or appeals. The Respondents repeated their ruling grievances in the mandamus petitions going so far to assert "all prior proceedings ... should be readjudicated." [198]

The timing of the filing of the Recusal Motion evidences its filing was driven by the Respondents' and Clients' displeasure with adverse rulings. The Court previously found:

The incidents raised by the Movants occurred well before the Recusal Motion was filed. The deposition skirmish between Shuker and Ginsberg occurred on August 9, 2005—almost a year before the Recusal Motion was filed. GrayRobinson knew as early as October 2005 G & L had filed the 46–page FOFCOL, yet the Movants waited ten months to file the Recusal Motion. The deposition in aid of execution incident between Shuker and Spradley occurred seven weeks prior to the filing of the Recusal Motion. The Recusal Motion was filed the day after the trial of the Knight and Huggins involuntary petitions began.[199]

No evidence presented at the sanctions trial refuted these findings.

### ii. The Recusal Motion was not filed for delay purposes.

Ginsberg asserted the motion was not filed for delay or any improper purposes:

Q: Did you file that motion to delay any proceedings?

---

**195.** Recusal Motion at pp. 29–30.

**196.** Recusal Motion at p. 13. The Movants devote five pages alone to protests of the Mataeka Judgment.

**197.** *Id.* at p. 18.

**198.** District Court Case No. 6:06–cv–01210–JA–KRS, Doc. No. 3, p. 3.

**199.** Feb. 27, 2007 Order at pp. 40–1.

A: No. As a matter of fact, at the time we filed the disqualification recusal motion, there [were] no proceedings in this court to do it.

Q: Well, did you file that motion in any way to harass or burden this Court?

A: I filed it for one reason and one reason only and that reason was that I believed I had an obligation to the client and an ethical obligation to the bar to file that motion.[200]

It is incorrect there were "no proceedings in this Court" pending at the time the Recusal Motion was filed. The Involuntary Cases, in which the Interim Trustee had been appointed, and the IPA AP were pending. The Respondents admit in their pleadings these proceedings were pending. They, in their First Petition, sought a writ of mandamus directing the undersigned to "stay all related proceedings" in the Evergreen cases and identified pending matters:

> Judge Briskman has continued to conduct business in the [Evergreen] related cases, including continuing the Interim Trustee [in the Involuntary Cases], conducting a status conference in the IPA adversary proceeding, scheduling a hearing to determine Mr. Shuker's request for expedited discovery in the APAM involuntary bankruptcy case and refusing to date to adjourn that involuntary bankruptcy case ... Instead, [Judge Briskman] has proceed[ed] with related matters in the ordinary course of business.[201]

The Respondents reiterated in their Supplemental Petition the undersigned "continued to conduct business" in Evergreen pending matters "including continuing the appointment of an Interim Trustee" in the Involuntary Cases.[202] They requested in their prayer for relief, among other things, the undersigned "be directed to stay all related proceedings." [203]

They sought further delay of pending matters through a Motion for Stay Pending Judicial Disposition of Mandamus Action seeking an "order staying all proceedings concerning the Recusal Motion until such time as the Mandamus Action has been resolved...." [204] They sought to delay the Recusal Motion proceedings through a motion to continue the final evidentiary hearing and a motion for a protective order prohibiting Evergreen from deposing Knight, Huggins, and Tamischa Ambrister.[205]

The timing of the filing of the Recusal Motion was strategic. It was filed to delay the Clients' involuntary proceedings, as evidenced by Ginsberg's time records.

Ginsberg worked on the Recusal Motion nearly daily from July 8, 2006 through July 18, 2006 and revised and finalized the pleading on July 27, 2006, its date of filing. Ginsberg stopped work on the Recusal Motion the day the Court entered the Orders to Compel (July 19, 2006) directing Knight and Huggins to produce discovery prior to the trials on the involuntary petitions. The first phase of the trials on the involuntary petitions was conducted on July 26, 2006 and the evidence presented indicated Knight and Huggins did not have colorable defenses to the petitions. The Respondents finalized and filed the Recusal Motion the next day, July 27, 2006.

---

200. Aug. 28, 2007 Hr'g Tr. vol. 1, p. 59, ll. 8–18

201. District Court 6:06–cv–1210–JA–KRS, Doc. No. 1 at pp. 3–4, 5.

202. *Id.* Doc. No. 3 at p. 6.

203. *Id.* Doc. No. 3 at p. 24.

204. Doc. No. 1522 at p. 3.

205. Doc. Nos. 1570, 1573.

They filed the Recusal Motion to delay the conclusion of the trials on the involuntary petitions and prevent the undersigned from presiding over those matters. The filing and prosecution of the Recusal Motion caused the pending matters in the Evergreen cases to be held in abeyance for several months.

The Respondents filed the Recusal Motion in the midst of the briefing period in the Mataeka Judgment appeal. They attempted to use the Recusal Motion to delay the appeal. They filed a Motion for Extension of Time to File Brief seeking a second extension of time to file their brief on the basis:

> While the Motion is pending in Bankruptcy Court, including the Motion to revoke all Orders previously entered in the instant and related actions (and thus encompassing the Judgment and Order from which Defendants have filed an appeal in the instant Court), it could be a waste of judicial and other resources to have the parties file appeal briefs challenging an Order that may be vacated.[206]

They repeated the Recusal Motion allegations in the Motion for Extension of Time to File Brief emphasizing the alleged "investigation" and requested a sixty-day extension. The District Court denied the Motion and the appellants' Motion for Reconsideration finding: "This motion is the latest effort of Appellants to avoid prosecuting an appeal from an order entered by the Bankruptcy Court. The stated reasons for wanting to put off the filing an

initial brief have varied with each filing seeking delay. Taken as a whole, the record is cause for concern."[207]

The Recusal Motion was filed in retaliation to rulings that were unfavorable to the Clients and for delay. Such motivations are not proper grounds for filing a pleading. The Recusal Motion was filed in bad faith.

## F. EXPERT WITNESS HARDING

■ The Sanctions Motions hearing established Harding's testimony in the recusal proceedings should be given limited weight.[208] All of the information he based his opinions on was provided by the Respondents.[209] His opinions were formulated upon inaccuracies, rumors, faulty assumptions, and omitted information. The Respondents told Harding a complaint had been filed and an investigation was pending when they had no evidence an investigation was pending and such a statement was contrary to the Judicial Council Rules.

They told Harding the Court had directed and engaged in *ex parte* communications. Such statements were unsupported by evidence in existence at the time the Recusal Motion was filed. The Respondents were, or should have been, aware of that evidence when they filed the Recusal Motion. Harding did not independently verify any of the information provided to him by the Respondents. The Respondents failed to provide important information to Harding, which would have impacted his analysis of the recusal matter.[210]

---

**206.** District Court Case No. 6:06–cv–00837–JA, Doc. No. 16 at ¶ 4.

**207.** *Id.* Doc. No. 43 (*see also* Doc. Nos. 22, 29).

**208.** "[E]xpert witnesses appear to assist in the court's decision-making process, not to control it." *Mullinax v. Aetna Life Ins. Co.,*

718 F.2d 1009, 1011 (11th Cir.1983) (*citation omitted*).

**209.** Aug. 28, 2007 Hr'g Tr. vol. 1, p. 123, ll. 1–4.

**210.** For example, the Respondents failed to share the email communications between Shuker and Spradley relating to the 46–page FOFCOL. Harding admitted the emails

## V. UNREASONABLE AND VEXATIOUS LITIGAITON

The Respondents, despite numerous opportunities, never corrected, withdrew, or attempted to withdraw the Recusal Motion. They litigated the Recusal Motion through trial. They, from the filing of the Recusal Motion on July 27, 2006 to the entry of the February 27, 2007 Order:

(i) filed nineteen substantive pleadings and made eleven appearances in the Evergreen case relating to the Recusal Motion;

(ii) instituted and litigated an appeal of the Order excluding the undersigned Judge as a witness;[211] and

(iii) filed and litigated in the District Court three petitions seeking writs of mandamus against the undersigned Judge.[212]

Their intention to pursue prosecution of the Recusal Motion was manifest on October 10, 2006—the date Evergreen filed its Rule 9011 Motion. The Respondents, on that same date, filed an Opposition seeking to compel the undersigned Judge to submit to testifying as a witness at the Recusal Motion trial.[213] They realleged their Recusal Motion allegations in the Opposition. A hearing on the witness exclusion issue and other matters related to the Recusal Motion was held on October 11, 2006, at which the Respondents appeared and, among other things, argued the undersigned was required to make disclosures. They did not raise any issues related to the Rule 9011 Motion.

The Respondents did not establish any of the allegations contained in the Recusal Motion, including that a judicial complaint had been filed against the undersigned. Even if they had established a judicial complaint had been filed, the Respondents' own expert witness testified, on the *first* day of the Recusal Motion trial, the filing of a judicial complaint does not give rise to grounds for recusal.[214] The Respondents pressed forward with prosecution of the Rescusal Motion despite expert testimony *that the investigation allegations were unsupported and the plain language of the Judicial Rules.*

The Respondents continued to prosecute the Recusal Motion even after the adverse rulings by the District Court on September 20, 2006 and December 26, 2006 finding, respectively, there was "no evidence before this court that such an investigation has been undertaken, let alone that there has been a finding of wrongdoing on the

---

would have been relevant to his analysis of the recusal matter. Nov. 29, 2006 Hr'g Tr. vol. 1, pp. 128–131. The Respondents did not share with Harding the fact Shuker and Spradley had agreed to not exchange their FOFCOL. Had that fact been disclosed to Harding it would have made a difference to his opinion. *Id.* at pp. 99–100.

**211.** Doc. No. 1550. District Court Case No. 6:06–cv–01867–JA. The Respondents were also litigating their appeal (District Court Case No. 6:06–cv–00837–JA) of the Judgment entered against their clients on March 22, 2006 in *Cuthill v. Knight et al.*, AP No. 6:01–ap–00232–ABB.

**212.** District Court Case No. 6:06–cv–01210–JA–KRS (filed August 14, 2006); District Court Case No. 6:06–cv–01807–JA–JGG (filed November 27, 2006).

**213.** Doc. No. 1543. The Respondents' prayer for relief makes clear their intention to litigate and not withdraw the Recusal Motion in which they and the Clients requested: "that the Motion [to exclude the undersigned as a witness] be denied, or alternatively that a neutral judge preside[ ] over a hearing on the [Recusal] Motion or that Judge Briskman make a full disclosure on the record consistent with the foregoing, and for any such other and further relief this Court deems just and equitable." Doc. No..1543 at p. 5.

**214.** Nov. 29, 2006 Hr'g Tr. vol. 1, p. 65, ll. 15–9.

part of the judge" and that their petition "was wholly lacking in merit." The Respondents' failure to present any evidence of an investigation to the District Court or file a renewed petition further demonstrates they had no evidence to support the allegations.

Evergreen, by letter sent to the Respondents dated January 22, 2007, offered the Respondents an opportunity to withdraw the Recusal Motion prior to the conclusion of the Recusal Motion trial: "We therefore invite the [Respondents] to withdraw the motion." [215] The Respondents did not withdraw the Recusal Motion or respond to the letter.

Spradley admitted the Respondents continued to prosecute the Recusal Motion even after it became evident the Recusal Motion "was not supportable." [216] Spradley wanted to withdraw the Recusal Motion, but Ginsberg and the Clients refused:

> ... I felt the way the evidence was being developed, the way the argument was going, that while I felt that we filed this in good faith, I felt that we couldn't continue to support it ... So I discussed this with Mr. Ginsberg and he respected my opinion and I respected his. He felt that it could still be supported in good faith and ... the same for the clients. So ultimately I was not given permission to withdraw the motion for recusal.[217]

Spradley testified he and Vitucci attempted to distance themselves from the Recusal Motion litigation by filing a motion to withdraw as counsel. Spradley and Vitucci sought a form of hybrid relief whereby

they wanted to withdraw as counsel for the Clients and appear as local counsel for Ginsberg.[218] Their request was contrary to the rules governing local counsel and was denied. Spradley and Vitucci then took a passive role in the litigation.[219] They subsequently filed a withdrawal motion which was granted.

Spradley and Vitucci's attempt to withdraw and ultimate withdrawal as counsel and shifting to a passive litigation role do not constitute withdrawal of the Recusal Motion. Spradley did not need Ginsberg's or the Clients' "permission" to withdraw his support of the Recusal Motion. He was obligated to terminate his advocacy once it became evident the pleading was not supportable.

The Respondents prosecuted the Recusal Motion knowing the allegations were unsupported by fact or law and engaged in litigation tactics that needlessly obstructed the resolution of pending matters in the Evergreen cases. They pursued frivolous, unjustifiable claims, greatly delayed the Evergreen cases, and unnecessarily multiplied proceedings, resulting in the expenditure of substantial judicial resources and causing Evergreen to incur excess attorneys' fees and costs of $671,517.69.

The Respondents' conduct was intentional and egregious. They signed, filed, and advocated the Recusal Motion in bad faith. They unreasonably and vexatiously multiplied proceedings.

## VI. DIVISION OF LABOR

There was conflicting testimony as to who was principally responsible for draft-

---

215. Doc. No. 1629.

216. Aug. 28, 2007 Hr'g Tr. vol. 2, p. 128, ll. 21–24.

217. *Id.* at pp. 126–7.

218. Doc. Nos. 1547, 1561.

219. Spradley discussed he wanted to file the motion to withdraw as counsel in November 2006, but it was not filed until 2007 due to personal issues. Personnel was available to Spradley to accomplish the filing of a withdrawal motion in 2006 were withdrawal truly desired.

ing the Recusal Motion. Ginsberg testified he "drafted the legal analysis and Spradley drafted the factual contentions. Then we exchanged drafts and did revisions and collaborated on the effort." [220] He asserted "GrayRobinson had thoroughly vetted this motion and had reviewed all the facts ...." [221] and Spradley supplied all of the information that formed the basis of the pleading. [222]

Spradley testified Ginsberg drafted the Recusal Motion and circulated it to him and the Clients for review. [223] He disputed Ginsberg's testimony, explaining the pleading was not "vetted out" by GrayRobinson management, but he alone at the firm, since it gives partners a high degree of autonomy, was the ultimate decision maker as to whether to file the pleading. [224]

Spradley's testimony was credible. Ginsberg's was not. The tenor and content of the Recusal Motion and the Respondents' billing records establish Ginsberg was its principal drafter and driving force. [225] Spradley was on vacation in July 2006 when Ginsberg, according to his time records, spent approximately thirty hours drafting the pleading. Ginsberg endorses each allegation made in the Recusal Motion. [226]

The acrid tenor of the pleading mirrors Ginsberg's demeanor throughout the Evergreen proceedings. "Disciplinary Rule 7–105(A)" and "EC 7–21" are cited and discussed in the Recusal Motion relating to alleged disciplinary violations by Shuker. No such provisions relating to attorney discipline exist in Florida. Attorneys practicing in Florida are governed by the Florida Rules of Professional Conduct. "Disciplinary Rule 7–105(A)" and "EC 7–21" are provisions of the Code of Professional Responsibility governing attorneys in the state of New York–Ginsberg's home jurisdiction. [227]

Spradley testified Vitucci played a minor role in the preparation of the Recusal Motion. [228] His testimony was unrefuted. Vitucci assisted with drafting summaries of events and proofreading the Recusal Mo-

220. Aug. 28, 2007 Hr'g Tr. vol. 2, p. 17, ll. 13–17.

221. *Id.* at p. 99, ll. 19–25; vol. 1, p. 124, ll.2–8 ("... but Mr. Spradley, you know, in a way had the luxury of a big law firm standing behind him.").

222. *See, e.g., Id.* vol. 2, p. 30, ll. 11–24; p. 31, ll. 14–20; p. 32, ll. 14–23; p. 40, ll. 14–21; p. 95, ll. 10–22; p. 97, ll. 1–7.

223. Aug. 28, 2007 Hr'g Tr. vol. 2, p. 121, ll. 16–23; p. 122, ll. 2–6; p. 134, ll. 9–15.

224. Aug. 28, 2007 Hr'g Tr. vol. 2, pp. 120–21: "... it would be an incorrect characterization to suggest that a group of GrayRobinson partners were sitting around reading, drafting the motion. That's just not the case." *See also* pp. 134–135: Q: "... But what you're telling me is [Ginsberg] drafted it, you made some edits and then it was filed pretty much the way he drafted." A: "That's correct. We

had, you know, we had input. But the tone though, I mean it was a recusal motion. But it's—it's a little rough in tone."

225. Evergreen's Exh. C. Ginsberg's time spent on the Recusal Motion exceeded the time documented in his billing records. He testified he did not account for all of his time spent on the Recusal Motion in billing statements. Aug. 28, 2007 Hr'g Tr. vol. 2, p. 18–19.

226. Aug. 28, 2007 Hr'g Tr. vol. 2, p. 68, ll. 14–17: Q: "... Do you think this recusal motion on the record was completely justified?" A: "Yes." *See also. Id.* at pp. 56–7.

227. *See* www.mysba.org. The New York Lawyer's Code of Professional Responsibility consists of Canons, Ethical Considerations, and Disciplinary Rules.

228. Aug. 28, 2007 transcript at p. 138, ll. 16–25.

tion.[229] She was called upon to sign and file the pleading since she was the only attorney authorized to utilize the Court's CM/ECF electronic filing system.[230]

## VII. EVERGREEN'S FEES AND COSTS

Evergreen originally requested an award of sanctions against the Respondents, jointly and severally, of $671,517.69 representing the excess fees and costs incurred by Evergreen in defending the Recusal Motion, responding to the mandamus petitions, and prosecuting the Sanctions Motions. Evergreen amended its award request to reflect the global settlement. It credits to GrayRobinson, Vitucci, and Spradley the amount of $300,000.00 pursuant to the August 8, 2007 settlement and seeks an award of the balance, $371,517.69, against Ginsberg and his firm.

The figure $671,517.69 is comprised of total fees of $631,266.00 and total costs of $40,251.69 incurred as follows: $365,746.49 by Shuker's firm (consisting of fees of $345,124.50 and costs of $20,621.99); $221,212.85 by the Busey Firm (consisting of fees of $203,126.00 and costs of $18,086.85); $45,149.87 by Saxon, Gilmore, Carraway, Gibbons, Lash & Wilcox, P.A., counsel for Evergreen's Steering Committee (consisting of fees of $44,515.50 and costs of $634.37); fees $11,000.00 by Cuthill; and $28,408.48 by Lubet (consisting of fees of $27,500.00 and costs of $908.48).[231]

Ginsberg contends Evergreen's fees are excessive and there was duplication of effort amongst Cuthill, Shuker's firm, and the Busey Firm. Evergreen's counsel and Cuthill put procedures in place to prevent the duplication of effort and ensure the reasonableness of counsels' fees.[232] There were on-going communications amongst counsel and Cuthill regarding the allocation of work and review of billing statements.[233]

The reasonableness of attorney fees and costs is determined through an examination of the criteria enunciated by the Fifth Circuit Court of Appeals in *In the Matter of First Colonial Corp. of America*, 544 F.2d 1291, 1299 (5th Cir.1977) and *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). The criteria are applied universally in bankruptcy attorney compensation matters.

This case has been extraordinary, involving novel legal issues and intense litigation. Evergreen was compelled to expend significant resources in defending the Recusal Motion, addressing the mandamus proceedings, and prosecuting the Sanctions Motions. Evergreen's attorneys are highly experienced, capable, and reputable. Their involvement with the recusal matter required substantial hours of their time and impeded their ability to work on other matters.

The Evergreen billing statements reflect there was no overlap of effort amongst counsel.[234] After consideration of the *First Colonial* and *Johnson* factors, the reasonable number of hours for the services performed by Evergreen's professionals and the reasonable billing rates are: (i) 1,475.1 hours performed by Latham Shuker Eden & Beaudine L.L.P. attorneys and paralegals at their respective hourly rates ranging between $90.00 and $350.00; (ii) 794.8 hours performed by

---

**229.** Doc. No. 1709, Part 2, ¶ 13.

**230.** *Id.*

**231.** Evergreen's Exh. B.

**232.** Aug. 28, 2007 Hr'g Tr. vol. 1, pp. 13–15, 22.

**233.** *Id.*

**234.** Evergreen's Exh. A.

Smith Hulsey & Busey attorneys and paralegals at their blended hourly rate of $255.57; (iii) 245.4 hours performed by Saxon Gilmore attorneys and paralegals at their respective hourly rates ranging between $175.00 and $350.00; (iv) 55.0 hours performed by Lubet at the hourly rate of $500.00 based upon his time spent on research and preparation, Court appearances, and travel; and (v) 50.25 hours performed by Cuthill at the hourly rate of $219.00.[235]

Total fees for Evergreen's professionals in the amount of $631,266.00 and total costs in the amount of $40,251.69 are reasonable after consideration of the *First Colonial* and *Johnson* factors and all of the facts and circumstances of this case.

## VIII. GLOBAL SETTLEMENTS

Evergreen filed the Sanctions Motions against the Respondents during the pendency of the Recusal Motion proceedings. A number of issues and claims intersected in the Recusal Motion proceedings, which the Sanctions Motions brought to a head. These claims and issues were mostly resolved through a series of settlement agreements amongst the various parties. The resolution is the result of the parties' voluntary mediation. Prior to execution of the settlement agreements, the Mataeka AP defendants had not made any voluntary payments on the Mataeka Judgment.[236] The only parties who did not participate in the settlements were Ginsberg and his firm.

The global settlement includes the settlement agreement between Evergreen,

Latham Shuker Eden & Beaudine L.L.P., Shuker, GrayRobinson, Vitucci, and Spradley executed on August 8, 2007 resolving the Sanctions Motions pursuant to which GrayRobinson will pay $300,000.00 (approximately half of the fees sought by Evergreen in its Sanctions Motions) to Evergreen on or before October 1, 2007 and Evergreen will withdraw the Sanctions Motions as to GrayRobinson, Vitucci, and Spradley.[237]

## IX. CONCLUSIONS

The Respondents' presentation at the sanctions trial reinforces each of the findings and conclusions made in the February 27, 2007 Order. The Respondents, displeased with adverse rulings and desiring to delay pending matters, particularly the Involuntary Cases, drafted the Recusal Motion making scandalous allegations against the undersigned and Shuker. The pleading is a conglomeration of gossip, intentional misrepresentations, and untruths. It had no evidentiary or legal support at the time it was filed, or at any time. Not a single claim has factual basis or legal merit.

The Respondents conducted no reasonably thorough and objective investigation of the facts regarding the "complaint" and "investigation" allegations. Their primary "fact" sources were Anthony who related "bar gossip" to Spradley and Spradley's initial telephone conversation with Hudson. Hudson never said an "investigation" was pending against the undersigned. It was unreasonable to rely on these sources as a

**235.** Evergreen Exh. A.

**236.** *Knight, Huggins, Mataeka, and APAM,* in November 2002, attempted to tender to Cuthill check number 0091 in the amount of $1,539,955.49 as "payment in full" of the Mataeka "loan." Cuthill refused to accept the check. A portion of these funds were

turned over by GrayRobinson to Cuthill pursuant to the garnishment writ and the remaining funds are the subject of the turnover complaint in Adversary Proceeding 6:07–ap–00030–ABB.

**237.** *Id.*

basis for the Recusal Motion. Ginsberg, who testified he knew nothing for sure, conducted no investigation, other than reading ATN case documents, which are unrelated and irrelevant to the Evergreen case.

The Respondents conducted no reasonable inquiry into the law regarding their "complaint" and "investigation" allegations. Such allegations are contrary to the Judicial Council Rules. The case law contained in the Recusal Motion is inflammatory and irrelevant. They did not consult with Harding until after the pleading was filed. They presented no law supportive of their allegations. Their contentions, at all times, were unsupported by and contrary to law. It was objectively unreasonable for the Respondents to make the "complaint" and "investigation" allegations.

The allegations relating to the "ex parte" communications were made with no factual or legal support and were made in bad faith. The Respondents conducted no reasonably thorough and objective investigation of the facts regarding the allegations. They knew the Court at no time directed or suggested any ex parte communications be made, received or reviewed, and had no evidence to support such allegations, yet they alleged the Court engaged in ex parte communications.

They conducted no reasonable inquiry into the law regarding the ex parte allegations. The allegations are contrary to the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, and the Local Rules of this Court. It was objectively unreasonable for the Respondents to allege the Court engaged in or directed ex parte communications.

The allegations relating to Shuker and his being "empowered" by the Court were made with no factual or legal support and were made in bad faith. The Respondents conducted no reasonably thorough and objective investigation of the facts regarding the allegations. The Respondents asserted in the Recusal Motion Shuker and his firm engaged in conduct requiring their disqualification. They later conceded Shuker's conduct did not constitute a basis for recusal. It was objectively unreasonable for the Respondents to allege Shuker engaged in conduct requiring his and his firm's disqualification and to seek recusal of the undersigned based on such conduct.

The Respondents had no factual basis for any of the Recusal Motion allegations. They were frivolous and without merit, and yet the Respondents signed, filed, and advocated the Recusal Motion through trial. They engaged in a continuous pattern of bad faith consistent with their course of conduct through the proceedings. They repeated the meritless claims in the District Court pleadings. They engaged in unreasonable, vexatious, and dilatory litigation tactics throughout the Evergreen cases. They ignored the lack of evidentiary and legal support for and mitigating facts of the allegations.

They compounded the Recusal Motion litigation by pursuing outrageous and untenable positions in the sanctions litigation, both in their pleadings and their testimony. They changed strategy for the sanctions hearing, shifting the focus to the alleged "investigation." They minimized the ex parte and Shuker disqualification allegations, maintaining those allegations were inconsequential, even though they were primary components of the Recusal Motion and the litigation. They based their "investigation" allegations on faulty circular logic: Because an alleged judicial complaint had been pending for some time it meant the Eleventh Circuit considered it a "serious matter" and was conducting an "investigation." Their position is contrary to any known facts and the Judicial Coun-

cil Rules, which Spradley and Ginsberg had read prior to filing the Recusal Motion.

Ginsberg's testimony was self-serving. He disregarded the facts, creating a revisionist history of events. His testimony was inconsistent with the Recusal Motion allegations. When confronted with the established facts, he sidestepped them giving unresponsive, obtuse answers. When asked to present evidentiary support for specific allegations he defaulted to his "recollection," his "assumption," or Spradley as the sources.

The Recusal Motion was filed and litigated as an offensive litigation strategy and for punitive purposes. Ginsberg was its architect and engineered the litigation. Spradley and Vitucci acquiesced. At no time did the Respondents curtail the recusal proceedings, even when there was absolutely no evidence supporting any of the allegations and Spradley no longer "had the stomach" for the litigation.[238]

The Respondents willfully abused the judicial process. It was objectively unreasonable to make the allegations contained in the Recusal Motion. No reasonable attorney could believe the allegations had merit. The Respondents signed, filed and advocated the Recusal Motion in bad faith. They acted with subjective and objective bad faith. Ginsberg, his firm, GrayRobinson, Vitucci, and Spradley failed to show cause why sanctions should not be imposed against them pursuant to 11 U.S.C. Section 105(a) and the Court's inherent authority to sanction wrongful conduct. Sanctions are due to be imposed against them pursuant to Federal Rule of Bankruptcy Procedure 9011, 11 U.S.C. Section 105(a), and the Court's inherent powers.

Sanctions in the amount of $300,000.00, representing approximately forty-five percent of Evergreen's fees and costs incurred in the recusal litigation, have been imposed, pursuant to the November 16, 2007 Order (Doc. No. 1726), against GrayRobinson, Vitucci, and Spradley, jointly and severally, for their signing, filing, and advocating of the Recusal Motion and their unreasonable and vexatious litigation of the pleading, which acts were done in bad faith.[239] The Court is satisfied the $300,000.00 payment GrayRobinson, Vitucci, and Spradley have agreed to make to Evergreen pursuant to the global settlement agreement is a sufficient sanction to deter any future wrongful conduct by GrayRobinson, Vitucci, and Spradley. No additional monetary sanctions are necessary.

Monetary sanctions are due to be imposed against Ginsberg and his firm in an amount that exceeds the amount imposed against GrayRobinson, Vitucci, and Spradley due to Ginsberg's leading role in the drafting and litigation of the Recusal Motion. Sanctions in the amount of $371,517.69, representing approximately fifty-five percent of Evergreen's excess fees and costs incurred in the recusal litigation, are due to be imposed against Ginsberg and his firm, jointly and severally, for their wrongful acts falling within the purview of Rule 9011, Section 105(a) of the Bankruptcy Code, and the Court's inherent powers to sanction wrongful conduct.

The imposition of additional sanctions is warranted to deter any future comparable conduct by Ginsberg and his firm or by others similarly situated. An additional nonmonetary sanction of enjoining Ginsberg and his firm from appearing before

---

**238.** Aug. 28, 2007 Hr'g Tr. vol. 2, p. 126, ll. 1–13.

**239.** Ginsberg has appealed the November 16, 2007 Order.

this Court for a period of five years is due to be imposed.

## CONCLUSIONS OF LAW

### I. DUE PROCESS

■ Evergreen filed the Sanctions Motion pursuant to Federal Rule of Bankruptcy Procedure 9011(c).[240] Evergreen seeks sanctions of $671,517.69, representing the fees and costs it expended in connection with the recusal proceedings. The Court issued the Show Cause Order reiterating the Court would make a sanctions determination pursuant to Rule 9011 and its "inherent powers including its 11 U.S.C. Section 105(a) powers." [241]

GrayRobinson recognizes the Court's inherent power to determine whether the Respondents' actions are sanctionable.[242] Ginsberg continues to argue he and his firm were not afforded due process regarding the possible imposition of sanctions against the Respondents pursuant to Section 105 of the Bankruptcy Code.[243]

The Respondents had fair, repeated, and ample notice a sanctions determination would be made relating to their signing, filing, and advocating of the Recusal Motion. The Respondents were put on notice as early as February 27, 2007 their conduct with respect to the recusal matter may be subject to sanctions. The Respondents' actions regarding the Recusal Motion were the subject of virtually every hearing held and pleading filed post-entry of the February 27, 2007 Order.[244] The February 27, 2007 Order, the Sanctions Motions, and the Show Cause Order set forth in explicit detail what specific conduct is at issue and the reasons why the conduct may warrant sanctions. They had notice sanctions may include Evergreen's fees and costs. They were given full opportunity to respond to the Sanctions Motions and Show Cause Order and to justify their actions.

The Respondents were afforded due process regarding the Sanctions Motions and Show Cause Order in conformity with the standards set forth by the Eleventh Circuit Court of Appeals. *Glatter. v. Mroz (In re Mroz)*, 65 F.3d 1567, 1575 (11th Cir.1995); *Donaldson v. Clark*, 819 F.2d 1551, 1559–60 (11th Cir.1987) (*en banc*).[245]

---

**240.** Federal Rule of Bankruptcy Procedure 9011 is virtually identical to Federal Rule of Civil Procedure 11. Evergreen cited to 11 U.S.C. Section 105(a) as a basis for the Sanctions Motions, but did not substantively address the Bankruptcy Code provision in the pleadings.

**241.** Show Cause Order at p. 7.

**242.** "GrayRobinson did not act in bad faith and this Court should exercise restraint and discretion in exercising its § 105 powers." (Doc. Nos. 1677 at ¶ 23; 1678 at ¶ 23). "GrayRobinson does not dispute the jurisdiction of this Court to impose sanctions under the authority of 11 U.S.C. § 105(a)." (Doc. No. 1717 at ¶ 29).

**243.** His objection to the sanctions trial proceeding on the basis the Order to Show Cause does not "sufficiently lay[] out the activities that Your Honor believes were conducted in

violation of any rules of conduct ...." was overruled. (August 28, 2007 transcript at p. 53, ll. 18–25).

**244.** The parties were provided notice as early as February 2007 their actions regarding the Recusal Motion may be subject to sanctions, including the imposition of sanctions through the Court's inherent powers. The February 27, 2007 Order held at p. 13: "An imposition of sanctions against [the Respondents], their clients, and/or their firms may be appropriate if it is determined the pleading was presented in violation of Rule 9011. Their actions may also be subject to sanctions pursuant to the Court's inherent powers to address wrongful conduct."

**245.** The Eleventh Circuit in *Donaldson* explained: "If an attorney is said to have submitted a complaint without any basis in fact, Rule 11 alone should constitute sufficient no-

## II. SANCTIONING POWERS

### A. FEDERAL RULE OF BANK-RUPTCY PROCEDURE 9011

#### 1. Certifications and Culpability

■ Evergreen seeks an imposition of sanctions against the Respondents pursuant to Rule 9011(c) for their signing, filing, and advocating of the Recusal Motion. Rule 9011(c) allows for the imposition of an "appropriate sanction" for a violation of subdivision (b) of Rule 9011. Sanctions may be imposed upon "the attorneys, law firms, or parties that have violated subdivision (b) *or are responsible for the violation.*" Fed. R. Bankr.P. 9011(c) (2007) (*emphasis added*). An attorney may be sanctioned pursuant to Rule 9011 even though the attorney did not sign the paper but orchestrated its filing. *Id.*[246]

Subdivision (b) of Rule 9011 provides, in part:

(b) *Representations to the Court.* By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support after a reasonable opportunity for further investigation or discovery. . . .

Fed. R. Bank. P. 9011(b).

■ An attorney cannot escape sanctions by relying on the work of another. Each attorney must independently verify the facts and reasoning of the cases cited to allow him or her to certify the signed pleadings comports with Rule 9011. *In re Burt,* 179 B.R. 297, 303 (Bankr.M.D.Fla. 1995); *Pravic v. U.S. Industries–Clearing,* 109 F.R.D. 620, 623 (E.D.Mich.1986).

■ Ginsberg, his firm, GrayRobinson, Spradley, and Vitucci signed, filed, submitted, and advocated the Recusal Motion. They, by presenting the Recusal Motion to the Court, certified that to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the pleading did not violate any provision of Rule 9011(b). They were each responsible for presenting and advocating the pleading. Ginsberg, Spradley, Vitucci, and their firms are all culpable, pursuant to Rule 9011(c), for any violations of Rule 9011(b).

---

tice of the attorney's responsibilities since the rule explicitly requires the attorney to certify that a complaint is well grounded in fact." *Donaldson,* 819 F.2d at 1559–60.

**246.** The FED.R.CIV.P. 11 advisory committee's note (1993) explains: "The sanction should be imposed on the persons—whether attorneys, law firms, or parties—who have violated the rule or who may be determined to be responsible for the violation . . . The revision [to subsection (c)] permits the court to consider whether other attorneys in the firm, co-counsel, other law firms, or the party itself should be held accountable for their part in causing a violation."

## 2. Objective Standard

Rule 9011 incorporates an objective standard. *Donaldson*, 819 F.2d at 1556. Application of the objective standard in a sanctions determination involves a two-step analysis: "whether the party's claims are objectively frivolous in view of the facts or law and then, if they are, whether the person who signed the pleadings should have been aware that they were frivolous; that is, whether he would have been aware had he made a reasonable inquiry." *Jones v. Int'l Riding Helmets, Ltd.*, 49 F.3d 692, 695 (11th Cir. 1995); *Mroz*, 65 F.3d at 1573.

Factors regarding the reasonableness of the prefiling inquiry include how much time for investigation was available to the signer and whether the pleading "was based on a plausible view of the law." *Jones*, 49 F.3d at 695. "Rule 9011 is intended to deter claims with *no* factual or legal basis at all...." *Davis v. Carl*, 906 F.2d 533, 538 (11th Cir.1990). Factually groundless allegations where the presenter offer no cognizable evidence to support his allegations merit Rule 9011 sanctions. *Id.* at 536–37. Sanctions are appropriate where the presenter has "ignored the plain language of the applicable statute" or "deliberately failed to cite controlling authority contrary to their position." *Id.* at 538.

The reasonableness of a position is determined in light of the existing situation and the known facts at the time the paper is signed, filed, or presented. *Jones*, 49 F.3d at 694–95. An attorney's good faith belief that a claim or argument has merit is insufficient to avoid Rule 9011 sanctions. *Mroz*, 65 F.3d at 1573. The belief "must be in accord with what a reasonable, competent attorney would believe under the circumstances." *In re Brown*, 152 B.R. 563, 567 (Bankr.E.D.Ark. 1993).

Sanctions may be imposed pursuant to Rule 9011 for both filing pleadings and later advocating positions taken that are without evidentiary support. *Turner v. Sungard Bus. Sys., Inc.*, 91 F.3d 1418, 1421 (11th Cir.1996). "A complaint is factually groundless and merits sanctions where the plaintiff has absolutely no evidence to support its allegations." *Mroz*, 65 F.3d at 1573. Rule 9011's requirement the facts alleged have evidentiary support "requires, at a minimum, that there is reason to believe that, when all the facts are known, the Court will find that they support the relief requested." *Four Star Fin. Serv., LLC v. Commonwealth Mgmt. Assoc.*, 166 F.Supp.2d 805, 809 (S.D.N.Y. 2001).

## B. INHERENT POWERS AND 11 U.S.C. SECTION 105(a)

Federal courts have the inherent power to sanction parties and lawyers, or both, for conduct which abuses the judicial process. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Bank of New York v. Sunshine Jr. Stores, Inc. (In re Sunshine Jr. Stores, Inc.)*, 456 F.3d 1291, 1304 (11th Cir.2006). This inherent power is independent of Rule 9011. *Mroz*, 65 F.3d at 1575. It can be invoked "even if procedural rules exist which sanction the same conduct ... for these rules are not substitutes for the inherent power." *Chambers*, 501 U.S. at 46, 49, 111 S.Ct. 2123. "Therefore, although certain conduct may or may not be violative of Rule 11 or Bankruptcy Rule 9011, it does not necessarily mean that a party will escape sanctions under the court's inherent powers." *Mroz*, 65 F.3d at 1575.

"The key to unlocking a court's inherent power is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir.1998). Bad faith exists where

"an attorney knowingly or recklessly raises a frivolous argument...." *Id.* "A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *Id.*

 "Because of their very potency, inherent powers must be exercised with restraint and discretion. A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers,* 501 U.S. at 44–45, 111 S.Ct. 2123 (*internal citations omitted*). The assessment of attorney's fees as a sanction is within a federal court's inherent power. *Id.* at 45, 111 S.Ct. 2123. Where an award of fees is directly tied to delays and protracted litigation caused by bad faith conduct the award is well within a court's inherent powers. *Sunshine,* 456 F.3d at 1305, 1316.

 A federal court is empowered by its inherent powers to admit and suspend attorneys. "It is axiomatic that federal courts admit and suspend attorneys as an exercise of their inherent power." *In re Finkelstein,* 901 F.2d 1560, 1564 (11th Cir. 1990).

 Bankruptcy courts, in addition to the federal courts' inherent powers, have statutory powers deriving from Section 105 of the Bankruptcy Code to address wrongful conduct. *Hardy v. U.S. (In re Hardy),* 97 F.3d 1384, 1389 (11th Cir.1996); *Jove Eng'g, Inc. v. IRS,* 92 F.3d 1539, 1543 (11th Cir.1996) (explaining Section 105(a) is distinct from the court's inherent powers).[247] Section 105(a) of the Bankruptcy Code grants a bankruptcy court broad power in the administration of bankruptcy cases:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a). The inclusion of the word "any" in Section 105(a) "... encompasses all forms of orders including those that award monetary relief.... The broad term 'any' is only limited to those orders that are 'necessary or appropriate' to carry out the Bankruptcy Code." *In re Jove,* 92 F.3d at 1554.

 A Bankruptcy Court may invoke its statutory powers of Section 105(a) to redress Rule 9011 violations, bad faith, and unreasonable, vexatious litigation. *In re Clark,* 223 F.3d 859, 864 (8th Cir.2000); *In re Volpert,* 110 F.3d 494, 500 (7th Cir. 1997); *In re Bryson,* 131 F.3d 601, 603 (7th Cir.1997); *In re Rainbow Magazine, Inc.,* 77 F.3d 278, 284 (9th Cir.1996).

## C. RESPONDENTS' SANCTIONABLE CONDUCT

 The Respondents were required "to perform a reasonably thorough and objective investigation of the facts before asserting them as the bases" for the Recusal Motion. *Byrne v. Nezhat,* 261 F.3d 1075, 1115 (11th Cir.2001). The Re-

---

247. "Bankruptcy courts, both through their inherent powers as courts and through the general grant of power in section 105, are able to police their dockets and afford appropriate relief." 2 Collier on Bankruptcy ¶ 105.01[2], at 105–7 (15th ed. rev.2007). Some courts have taken the position Section 105 "intended to imbue the bankruptcy courts with the inherent power recognized by the Supreme Court in [*Chambers*]." *See, e.g., Jones v. Bank of Santa Fe (In re Courtesy Inns. Ltd., Inc.),* 40 F.3d 1084, 1089 (10th Cir. 1994).

spondents falsely certified they conducted "an inquiry reasonable under the circumstances." They did not conduct a reasonable investigation of the facts, but constructed the Recusal Motion from gossip, hearsay, untruths, and assumptions. Every allegation contained in the Recusal Motion is objectively frivolous. The Respondents, each of them, knew or should have been aware the allegations were frivolous.

There is not one scintilla of evidentiary support for the Recusal Motion allegations. The allegations were unsupported at the time the pleading was filed and were not likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. The Respondents conducted no reasonably thorough and objective investigation of the actual facts. The Recusal Motion is without legal support. The Respondents' allegations and legal contentions were not warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

The Respondents conducted no reasonably thorough and objective investigation of the facts regarding the "complaint" and "investigation" allegations. It was unreasonable to rely on Anthony, who conveyed "bar gossip" to Spradley, and Hudson, who never said an "investigation" was pending against the undersigned, as the Respondents' primary "fact" sources. It was unreasonable for the Respondents to use ATN case documents as "fact" sources. The ATN case is unrelated and irrelevant to the Evergreen case.

The Respondents assert the Judicial Council Rules support their allegations an investigation is pending against the undersigned as the result of an alleged judicial complaint. The procedures governing judicial complaints in the Eleventh Circuit are set forth in Addendum Three and Appendix A of the Judicial Council Rules, which conform with the Judicial Conduct and Disabilities Act codified at 28 U.S.C. Sections 351, *et. seq.*[248]

██ Any person may file a written complaint alleging a judge "has engaged in conduct prejudicial to the effective and expeditious administration of the business of the courts...." Judicial Council Rules, *Preface.* Judicial complaints are confidential matters that shall not be disclosed to the public. Judicial Council Rules 15(a), 16.

The Chief Judge of the Eleventh Circuit, upon receiving a properly filed complaint, shall "review" it and determine what action to take:

> In determining what action to take, the Chief Judge may conduct a limited inquiry for the purpose of determining—
>
> (1) whether appropriate corrective action has been or can be taken without the necessity for a formal investigation; and
>
> (2) whether the facts stated in the complaint are either plainly untrue or are incapable of being established through investigation.

Judicial Council Rule 4(a). The Chief Judge, after conducting a review, may dismiss the complaint pursuant to Rule 4(b) or appoint a special committee, pursuant to Rule 4(c), "to investigate the allegations of the complaint and to report thereon to the Judicial Council."

In the event of a dismissal, the Chief Judge shall prepare a written order setting forth the reasons for dismissal. The Clerk, pursuant to Rule 4(b), shall provide a copy of the order to the complainant and

---

**248.** Appendix A contains 28 U.S.C. Sections 351 through 364.

the complained-of judge and notify them of the right to petition the Judicial Council for review of the dismissal order. If a special committee is appointed pursuant to Rule 4(c), the Chief Judge "shall notify the complainant and the complained-of judge of the appointment of a special committee and of the identify of its members."

■■■■■ The word "investigation" has precise, specialized meaning within the Judicial Council Rules. The filing of a judicial complaint does not necessarily result in an investigation, nor does the non-dismissal of a complaint mean an investigation is pending. An investigation only ensues in the circumstance where the Chief Judge appoints a special committee. The "limited inquiry" of Rule 4(a) is not an investigation.[249]

■■■ The Respondents' assertion an investigation was pending because the alleged complaint had not been dismissed contradicts the plain, unambiguous language of Judicial Council Rules. They did not inquire of Hudson whether he had received notice of the appointment of a special committee. Their reliance on Webster's definition of "investigation" is indefensible. They speculated an investigation was pending. "Speculative assertions" and "rank speculation" do not meet the reasonable inquiry standard of Rule 11. *Lowery v. Alabama Power Co.,* 483 F.3d 1184, 1215, n. 67 (11th Cir.2007). Their "investi-gation" allegations were without merit and made in bad faith.

The Respondents cited various cases as support for the Recusal Motion, none of which provide legal support for their contentions. As introduction to their case law discussion they stated: "There are, fortunately, few cases in which courts have had to apply the recusal statute to a circumstance in which a judge is under an investigation *like the instant investigation.* A notable exception is *United States v. Garrudo,* 869 F.Supp. 1574 (S.D.Fla.1994)."[250]

*Garrudo* involved a judge who was subject to a criminal investigation by the U.S. Attorney for the Eastern District of New York. They also cited *In re Lopez–Lukis,* 113 F.3d 1187 (11th Cir.1997), which involved a district court judge who was subject to a criminal investigation conducted by the public integrity section of the Department of Justice. The Respondents make reference to an Eleventh Circuit "protocol" for addressing recusal matters.[251] That "protocol" concerns recusal of judicial officers in the Eleventh Circuit in the event of arrest, indictment, or possible criminal investigation. *In re Lopez–Lukis,* 113 F.3d at 1188.

An investigation pursuant to the Judicial Council Rules is incomparable to the criminal investigations by the Justice Department in *Garrudo* and *Lopez–Lukis.*[252] The Recusal Motion contains no allega-

---

**249.** Lubet explained "The limited inquiry should *never* be confused with an investigation into misconduct. The limited inquiry actually eliminates or washes out about ninety eight percent—ninety-eight percent of all complaints go absolutely nowhere. Only two percent of all complaints ever proceed to the investigation state...." Nov. 29, 2006 Hr'g Tr. vol. 2, p. 14, ll. 4–17.

**250.** Recusal Motion at p. 20 *(emphasis added); see also* p. 23: "As in *Garrudo,* a judge was being investigated by a branch of government and, though the investigation never led to formal charges in *Garrudo,* the district court (and appellate en banc panel by split decision) concluded that he had to recuse himself while he was a subject of the investigation, pursuant to Section 455(a)." *Garrudo* was *affirmed* by *United States v. Cerceda,* 172 F.3d 806 (11th Cir.1999) (per curiam).

**251.** Recusal Motion at p. 21.

**252.** Respondents' Exh. No. 31 (Report of Steven Lubet) in the Recusal Motion trial.

tions regarding the violation of a criminal statute. The case law and protocol cited by the Respondents is inapposite, irrelevant, frivolous, and inflammatory. To rely on such inapplicable, inflammatory case law constitutes bad faith.

Ginsberg perpetuated the bad faith conduct with his examination of Harding regarding criminal matters and insinuating the undersigned had engaged in criminal conduct without any allegations or evidence of a potential criminal violation. His line of inquiry of Harding was irrelevant and defamatory.

The Respondents' allegations relating to "*ex parte*" communications were made with no factual or legal support and were made in bad faith. They conducted no reasonably thorough and objective investigation of the facts regarding the allegations. They knew, as evidenced by email communications and Spradley's testimony, the Court at no time directed or suggested any *ex parte* communications be made, received or reviewed, and had no evidence to support such allegations, yet they alleged the Court engaged in *ex parte* communications.

They conducted no reasonable inquiry into the law regarding the *ex parte* allegations. The allegations are contrary to the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, and the Local Rules of this Court. It was objectively unreasonable for the Respondents to allege the Court engaged in or directed *ex parte* communications.

The allegations relating to Shirker's conduct and an illicit relationship with the Court were made with no factual or legal support and were made in bad faith. The Respondents conducted · no reasonably thorough and objective investigation of the facts regarding the allegations. Despite demanding the disqualification of Shuker and his firm in the Recusal Motion, they did not seek disqualification when the alleged unethical conduct occurred. They later conceded Shuker's conduct did not constitute a basis for recusal. It was objectively unreasonable for the Respondents to allege Shuker engaged in conduct requiring his and his firm's disqualification and to seek recusal of the undersigned based on such conduct.

■ All of the relevant facts and circumstances establish the Recusal Motion was filed for improper purposes. "Courts are not required to determine with scientific certainty whether a respondent in the context of rule 9011(b)(1) was motivated by an improper purpose. It is sufficient if an assessment of the relevant facts and circumstances reaches that conclusion." *In re James*, 367 B.R. 259, 265 (Bankr. D.Conn.2007). It was filed to delay pending Evergreen matters, to harass the Court and Evergreen and its attorneys, and to punish the Court for unfavorable rulings.

The Respondents violated subdivisions (b)(1), (b)(2), and (b)(3) of Rule 9011. They did not conduct a reasonable prefiling investigation of the allegations contained in the Recusal Motion. They conducted no reasonable inquiry into the facts and the law. It was objectively unreasonable to make the allegations contained in the Recusal Motion. Not a single claim has factual or legal merit. They engaged in unreasonable, vexatious, and dilatory litigation tactics and willfully abused the judicial process. They signed, filed and advocated the Recusal Motion in bad faith. Spradley, Vitucci, GrayRobinson, Ginsberg, and Ginsberg's firm are each responsible and culpable for such wrongful conduct.

The Respondents failed to demonstrate and show cause why sanctions should not be imposed against them pursuant to Rule

9011, 11 U.S.C. Section 105(a), and the Court's inherent authority to sanction wrongful conduct. Sanctions are due to be imposed against Spradley, Vitucci, Gray-Robinson, Ginsberg, and Ginsberg's firm pursuant to Rule 9011(c), 11 U.S.C. Section 105(a), and the Court's inherent powers.

Spradley's contention he and Vitucci insulated themselves from the recusal proceedings by taking a passive role rather than withdrawing their support of the Recusal Motion is misguided. Spradley and Vitucci had ethical obligations to not endorse and pursue meritless claims, no matter how much pressure the Clients and/or Ginsberg exerted on them:

> Even though the client has decision making authority regarding the objectives of the representation, the clients' attorney can pursue those objectives only through lawful and ethical means Consequently, an attorney cannot silently acquiesce to a client who demands that the attorney pursue measures in the litigation that conflict with applicable ethics provisions. Rather, the attorney must stand his or her ground and refuse to act in a manner that flies in the fact of the relevant ethics rules.

*Thomas v. Tenneco Packaging Co., Inc.,* 293 F.3d 1306, 1327–28 (11th Cir.2002). Spradley and Vitucci acquiesced to the bad faith conduct and their passivity provides no mitigation or defense to the imposition of sanctions.

### D. SANCTIONS AWARD

██ Rule 9011(c)(2) allows for the award of "reasonable attorneys' fees and other expenses incurred as a direct result of the violation." Evergreen established it incurred excess fees of $631,266.00 and costs of $40,251.69 as a direct result of the Respondents' actions in the recusal proceedings. The reasonableness of attorney fees and costs is determined through an examination of the reasonableness criteria enunciated in *In the Matter of First Colonial Corp. of Am.,* 544 F.2d 1291, 1299 (5th Cir.1977) [253] and *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974). The twelve factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and the length of the professional relationship with the client; (12) awards in similar cases.

*Id.* at 717–18. Evergreen's fees of $631,266.00 and costs of $40,251.69, after reviewing each of the *Johnson* factors, are reasonable.

██ Rule 9011(c)(2) provides a sanction imposed "shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." [254] Sanctions may be monetary or include directives of nonmonetary nature.[255]

---

253. "In order to establish an objective basis for determining the amount of compensation that is reasonable for an attorney's services, and to make meaningful review of that determination possible on appeal, we held in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d at 717–19, that a district court must consider the following twelve factors in awarding attorneys' fees ..."

254. Rule 9011(c)(2).

255. *Id.*

■ Spradley, Vitucci, GrayRobinson, Ginsberg, and Ginsberg's firm engaged in wrongful and bad faith conduct. Ginsberg and his firm, as the primary drafters and advocators of the Recusal Motion, carry a greater responsibility for the Respondents' wrongful conduct. Monetary sanctions in the amount of $371,517.69, representing approximately fifty-five percent of Evergreen's fees and costs incurred in the recusal litigation, are due to be imposed against Ginsberg and his firm, jointly and severally, pursuant to Rule 9011(c), 11 U.S.C. Section 105(a), and the Court's inherent powers, for their signing, filing, and advocating of the Recusal Motion and their unreasonable and vexatious litigation of the pleading, which acts were done in bad faith.

■ The nonmonetary sanction of an injunction prohibiting Ginsberg and his firm from practicing before this Court for a period of five years is due to be imposed against them for their wrongful conduct. These sanctions, pursuant to Rule 9011(c)(2), are sufficient to deter repetition of the wrongful conduct or comparable conduct by others similarly situated.

GrayRobinson, Vitucci, and Spradley, pursuant to the August 8, 2007 settlement agreement with Evergreen, agreed to pay Evergreen $300,000.00 on or before October 1, 2007 in resolution of the Sanctions Motions. The Court held in the November 16, 2007 Order the settlement amount of $300,000.00 is an appropriate sanction to redress all wrongful acts of GrayRobinson, Vitucci, and Spradley falling within the purview of the Sanctions Motions, Section 105(a) of the Bankruptcy Code, and the Court's inherent powers to sanction wrongful conduct.

### Conclusion

The Respondents represented two clients who were key players in a Ponzi scheme and were determined to be crimi- nally and civilly responsible for the misap- propriation of more than $6,000,000.00 from Evergreen. The Clients attempted to shelter their assets from the creditors through off-shore trusts and spousal trans- fers, and, with the assistance and guidance of the Respondents, used a variety of legal means to frustrate their creditors. They took the offensive at every opportunity and litigated each matter aggressively.

The Clients and their counsel, like many litigants, were upset by unfavorable rul- ings. The Recusal Motion was baseless, both factually and legally. It was not filed for legitimate litigation purposes, but to punish the Court and Evergreen's counsel.

The Respondents and their Clients, in filing the Recusal Motion, crossed the line between zealous advocacy carried out in good faith and unprofessional sanctionable conduct—and once they crossed the line they kept going. They litigated the Recu- sal Motion through trial relentlessly, even when it became evident the pleading was baseless, with no regard for the impact on the reputations of the individuals and insti- tutions accused of wrongdoing. They pre- sented inconsistent and unfounded posi- tions throughout the recusal proceedings. The record is replete with instances of the Respondents' bad faith and dilatory tac- tics. When the Respondents were called upon to explain and defend their actions in the sanctions proceedings, they gave in- consistent, unfounded rationales for their actions.

Ginsberg was without shame and disin- genuous in testifying under oath that the Recusal Motion was not filed for delay, no matters were pending when the Recusal Motion was filed, and adverse rulings were not a basis for the Recusal Motion. His testimony was so outrageous and transpar- ently untrue, that it would shock the con- science of any reputable professional.

The Respondents acted in bad faith. Their actions were egregious. Ginsberg at no point expressed or demonstrated remorse, contrition or concern for the ramifications of his actions. Sanctions are due to be imposed.

Accordingly, it is

**ORDERED, ADJUDGED and DECREED** that monetary sanctions of $371,517.69 are hereby awarded to Evergreen and against Peter R. Ginsberg and Peter R. Ginsberg, P.C., jointly and severally, pursuant to Federal Rule of Bankruptcy Procedure 9011(c), 11 U.S.C. Section 105(a), and the Court's inherent powers; and it is further

**ORDERED, ADJUDGED and DECREED** that, pursuant to Federal Rule of Bankruptcy Procedure 9011, 11 U.S.C. Section 105(a), and the Court's inherent powers, Peter R. Ginsberg and Peter R. Ginsberg, P.C. are hereby barred from practicing before the United States Bankruptcy Court for the Middle District of Florida for a period of five years from the date of entry of this Order.

